# WASHINGTON *v.* CHRISMAN

No. 80-1349.   Argued November 3, 1981—Decided January 13, 1982

BURGER, C. J., delivered the opinion of the Court, in which BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined., *post*, p. 10.

*Ronald R. Carpenter* argued the cause and filed briefs for petitioner.

*Robert F. Patrick* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed by *Fred E. Inbau*, *Wayne W. Schmidt*, and *James P. Manak* for Americans for Effective Law

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether a police officer may, consistent with the Fourth Amendment, accompany an arrested person into his residence and seize contraband discovered there in plain view.

I

On the evening of January 21, 1978, Officer Daugherty of the Washington State University police department observed Carl Overdahl, a student at the University, leave a student dormitory carrying a half-gallon bottle of gin. Because Washington law forbids possession of alcoholic beverages by persons under 21, Wash. Rev. Code § 66.44.270 (1981), and Overdahl appeared to be under age,[1] the officer stopped him and asked for identification. Overdahl said that his identification was in his dormitory room and asked if the officer would wait while he went to retrieve it. The officer answered that under the circumstances he would have to accompany Overdahl, to which Overdahl replied "OK."

Overdahl's room was approximately 11 by 17 feet and located on the 11th floor of the dormitory. Respondent Chrisman, Overdahl's roommate, was in the room when the officer and Overdahl entered. The officer remained in the open doorway, leaning against the doorjamb while watching Chrisman and Overdahl. He observed that Chrisman, who was in the process of placing a small box in the room's medicine cabinet, became nervous at the sight of an officer.

Enforcement, Inc.; and by *David Crump* and *Michael C. Kuhn* for the Legal Foundation of America et al.

*Timothy K. Ford* filed a brief for the American Civil Liberties Union of Washington as *amicus curiae* urging affirmance.

[1] In addition, University regulations prohibit possession of alcoholic beverages on University property. Tr. 4, 34. At the suppression hearing, Officer Daugherty testified that, because of these regulations, he would have stopped Overdahl without regard to his age. *Id.*, at 6–7.

4

Within 30 to 45 seconds after Overdahl entered the room, the officer noticed seeds and a small pipe lying on a desk 8 to 10 feet from where he was standing. From his training and experience, the officer believed the seeds were marihuana and the pipe was of a type used to smoke marihuana. He entered the room and examined the pipe and seeds, confirming that the seeds were marihuana and observing that the pipe smelled of marihuana.

The officer informed Overdahl and Chrisman of their rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966); each acknowledged that he understood his rights and indicated that he was willing to waive them. Officer Daugherty then asked whether the students had any other drugs in the room. The respondent handed Daugherty the box he had been carrying earlier, which contained three small plastic bags filled with marihuana and $112 in cash. At that point, Officer Daugherty called by radio for a second officer; on his arrival, the two students were told that a search of the room would be necessary. The officers explained to Overdahl and Chrisman that they had an absolute right to insist that the officers first obtain a search warrant, but that they could voluntarily consent to the search. Following this explanation, which was given in considerable detail, the two students conferred in whispers for several minutes before announcing their consent; they also signed written forms consenting to the search of the room. The search yielded more marihuana and a quantity of lysergic acid diethylamide (LSD), both controlled substances.

Respondent was charged with one count of possessing more than 40 grams of marihuana and one count of possessing LSD, both felonies under Wash. Rev. Code § 69.50.401(c) (1976) (current version at Wash. Rev. Code § 69.50.401(d) (1981)). A pretrial motion to suppress the evidence seized in the room was denied; respondent was convicted of both counts. On appeal, the Washington Court of Appeals affirmed the convictions, upholding the validity of the search. 24 Wash. App. 385, 600 P. 2d 1316 (1979).

The Supreme Court of Washington reversed. 94 Wash. 2d 711, 619 P. 2d 971 (1980). It held that, although Overdahl had been placed under lawful arrest and "there was nothing to prevent Officer Daugherty from accompanying Overdahl to his room," the officer had no right to enter the room and either examine or seize contraband without a warrant. The court reasoned there was no indication that Overdahl might obtain a weapon or destroy evidence, and, with the officer blocking the only exit from the room, his presence inside the room was not necessary to prevent escape. Because the officer's entry into the room and his observations of its interior were not justified by "exigent circumstances," the seizure of the seeds and pipe were held not to fall within the plain-view exception to the Fourth Amendment's warrant requirement. The court went on to hold that because the students' consent to the subsequent search of the room was the fruit of the officer's initial entry, the contraband found during that search should also have been suppressed.[2]

Three justices dissented. They concluded it was reasonable for a police officer to keep an arrested person in sight at all times; accordingly, the officer had a legitimate reason for being in the place where he discovered the contraband, and was entitled, under the plain-view doctrine, to seize it.

We granted certiorari, 452 U. S. 959 (1981), and reverse.

## II

### A

The "plain view" exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize

---

[2] The opinion of the Supreme Court of Washington repeatedly refers to the Fourth Amendment and our cases construing it. The court did not, however, cite Art. I, § 7, of the Washington Constitution, which provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." While respondent, relying on this latter provision, urges that we "treat the case as having been decided under the Washington State Constitution," it is clear that the court did not rest its decision on an independent state ground.

what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be. *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971); *Harris* v. *United States*, 390 U. S. 234 (1968). Here, the officer had placed Overdahl under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification.[3] The officer had a right to remain literally at Overdahl's elbow at all times; nothing in the Fourth Amendment is to the contrary.

The central premise of the opinion of the Supreme Court of Washington is that Officer Daugherty was not entitled to accompany Overdahl from the public corridor of the dormitory into his room, absent a showing that such "intervention" was required by "exigent circumstances." We disagree with this novel reading of the Fourth Amendment. The absence of an affirmative indication that an arrested person might have a weapon available or might attempt to escape does not diminish the arresting officer's authority to maintain custody over the arrested person. See *Pennsylvania* v. *Mimms*, 434 U. S. 106, 109–110 (1977); *United States* v. *Robinson*, 414

---

[3] The trial court found that it was Overdahl who proposed to retrieve the identification, and, after being informed that Officer Daugherty would have to accompany him, agreed to the officer's presence. Respondent nevertheless claims that Overdahl was "coerced" to return to the room in violation of the Fifth Amendment, because he was in custody and had not yet been advised of his rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). He argues that since identification would serve as proof of Overdahl's age—an element of the offense for which he had been arrested—the officer could not ask him for this "incriminating" evidence without first advising him of his rights to counsel and to remain silent.

Assuming, *arguendo*, that Overdahl's Fifth Amendment rights were violated in some fashion, this does not vitiate the legality of his arrest, nor does it undercut the officer's right to maintain custody over an arrested person. The failure to give "*Miranda* warnings" might preclude introduction of incriminating statements made by Overdahl while in custody; but no such statements are even peripherally involved in this case. The act of going to the room was neither "incriminating" nor a "testimonial communication." Cf. *Fisher* v. *United States*, 425 U. S. 391, 408–414 (1976).

U. S. 218, 234–236 (1973). Nor is that authority altered by the nature of the offense for which the arrest was made.

Every arrest must be presumed to present a risk of danger to the arresting officer. Cf. *United States* v. *Robinson*, *supra*, at 234, n. 5. There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger. Moreover, the possibility that an arrested person will attempt to escape if not properly supervised is obvious. Although the Supreme Court of Washington found little likelihood that Overdahl could escape from his dormitory room, an arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation. Cf. *New York* v. *Belton*, 453 U. S. 454, 458–460 (1981); *United States* v. *Robinson*, *supra*, at 235.

We hold, therefore, that it is not "unreasonable" under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety—as well as the integrity of the arrest—is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested.[4]

It follows that Officer Daugherty properly accompanied Overdahl into his room, and that his presence in the room was lawful. With restraint, the officer remained in the doorway momentarily, entering no farther than was necessary to keep the arrested person in his view. It was only by chance that, while in the doorway, the officer observed in plain view what he recognized to be contraband. Had he exercised his undoubted right to remain at Overdahl's side, he might well have observed the contraband sooner.

---

[4] Indeed, were the rule otherwise, it is doubtful that an arrested person would ever be permitted to return to his residence, no matter how legitimate the reason for doing so. Such a rule would impose far greater restrictions on the personal liberty of arrested individuals than those occasioned here.

## B

Respondent nevertheless contends that the officer lacked authority to *seize* the contraband, even though in plain view, because he was "outside" the room at the time he made his observations. The Supreme Court of Washington noted that "[t]he record is in conflict as to whether Officer Daugherty stood in the doorway and then entered the room or whether, while in the doorway, he was in fact in the room." 94 Wash. 2d, at 716, 619 P. 2d, at 974. It concluded, however, that it "need not . . . let the result be determined by such niceties," and assumed for purposes of its decision that the officer "was in the room at the time he observed the seeds and pipe." *Ibid.* We agree that on this record "such niceties" are not relevant. It is of no legal significance whether the officer was in the room, on the threshold, or in the hallway, since he had a right to be in any of these places as an incident of a valid arrest.

Respondent's argument appears to be that, even if the officer could have stationed himself "inside" the room had he done so immediately upon Overdahl's entry, his 30- to 45-second hesitation was fatal; and that having chosen to remain in the doorway, the officer was precluded from proceeding further to seize the contraband. We reject this contention. Respondent's argument, if accepted, would have the perverse effect of penalizing the officer for exercising more restraint than was required under the circumstances. Moreover, it ignores the fundamental premise that the Fourth Amendment protects only against unreasonable intrusions into an individual's privacy. See *Katz* v. *United States*, 389 U. S. 347 (1967).

The "intrusion" in this case occurred when the officer, quite properly, followed Overdahl into a private area to a point from which he had unimpeded view of and access to the area's contents and its occupants. His right to custodial control did not evaporate with his choice to hesitate briefly in the doorway rather than at some other vantage point inside the

room.   It cannot be gainsaid that the officer would have had unrestricted access to the room at the first indication that he was in danger, or that evidence might be destroyed—or even upon reassessment of the wisdom of permitting a distance between himself and Overdahl.

We therefore conclude that, regardless of where the officer was positioned with respect to the threshold, he did not abandon his right to be in the room whenever he considered it essential.   Accordingly, he had the right to act as soon as he observed the seeds and pipe.[5]   This is a classic instance of incriminating evidence found in plain view when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy.   The Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances.[6]

### III

Since the seizure of the marihuana and pipe was lawful, we have no difficulty concluding that this evidence and the contraband subsequently taken from respondent's room were properly admitted at his trial.   Respondent voluntarily produced three bags of marihuana after being informed of his rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966).   He then consented, in writing, to a search of the room, after being advised that his consent must be voluntary and that he had an absolute right to refuse consent and demand procurement of a search warrant.   The seizure of the drugs pursuant

---

[5] The circumstances of this case distinguish it significantly from one in which an officer, who happens to pass by chance an open doorway to a residence, observes what he believes to be contraband inside.   See, *e. g.*, *Payton* v. *New York*, 445 U. S. 573, 585–589 (1980); *Johnson* v. *United States*, 333 U. S. 10, 14–15 (1948).

[6] In light of our disposition, we need not decide whether, as the Washington Court of Appeals held, the likelihood that the contraband would be destroyed constituted an "exigent circumstance" independently justifying the officer's entry into the room.

to respondent's valid consent did not violate the Fourth Amendment.[7]

The judgment of the Supreme Court of Washington is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The arrest in this case was made on the street. It gave Officer Daugherty no authority to enter Overdahl's quarters without his consent. But Overdahl wanted to retrieve his identification from his room; if Daugherty was willing for Overdahl to do so, he could properly condition his consent on accompanying Overdahl and keeping him under close surveillance. Accordingly, when Overdahl entered his room, Daugherty could stay as close to Overdahl as he deemed necessary to protect himself and maintain control over his arrestee. If it had been reasonably necessary for Daugherty to enter the room in pursuit of these purposes, he would not have violated any of Overdahl's Fourth Amendment rights. It is also plain enough that he was entitled to stand in the doorway and keep Overdahl in sight.

The record in this case is clear, however, that Daugherty did not leave the doorway and enter the room in order to protect himself or maintain control over Overdahl. Daugherty's uncontradicted testimony was that he entered the room solely to confirm his suspicion that the seeds and the seashell he had observed from the doorway were marihuana seeds and a seashell pipe that had been used to smoke marihuana.[1]

---

[7] We reject as frivolous the respondent's contention that, on the facts presented here, Officer Daugherty was required to knock and announce his presence at the doorway prior to entering the room.

[1] The officer testified at the suppression hearing that he had entered the room for just one purpose—"to affirm my beliefs and to seize the articles, if they were [contraband]." Tr. 44.

Daugherty made no claim that he entered the room as a necessary incident to the permission given Overdahl to secure his identification. Rather, he claimed that the entry was justified because of what was in plain view on the desk inside the room.

The plain-view doctrine, however, does not authorize an officer to enter a dwelling without a warrant to seize contraband merely because the contraband is visible from outside the dwelling. This is settled law. As the Court said in *Coolidge* v. *New Hampshire*, 403 U. S. 443, 468 (1971):

"[P]lain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has re-

---

The officer also testified:

"I stood in the doorway without entering, actually physically entering the room. . . . I was standing against the doorjamb. . . . I was not in the room. I was in the doorway." *Id.*, at 7, 9, 21.

The trial court stated in its memorandum opinion that "[t]he officer stood in the doorway, and watched [Overdahl]," observed the seashell pipe and the seeds from the doorway, and *"then entered* the room and examined the pipe and seeds closely." App. 47 (emphasis added). Similarly, the Court of Appeals stated: *"Prior to entering the room,* the officer saw from his vantage point in the doorway what he believed to be contraband. *Only at that time, did he cross the threshold* and seize the pipe and marijuana seeds." 24 Wash. App. 385, 389, 600 P. 2d 1316, 1318 (1979) (emphasis added).

As I read the Supreme Court of Washington's opinion, the court held that whether or not the officer had physically entered the room by standing in the doorway, his presence in the doorway was sufficiently intrusive that his observations were unlawful unless he could justify his presence. The court concluded that the officer should have remained outside the room, since there was no indication that Overdahl was likely to escape, destroy evidence, or seize a weapon.

peatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. *Taylor* v. *United States*, 286 U. S. 1; *Johnson* v. *United States*, 333 U. S. 10; *McDonald* v. *United States*, 335 U. S. 451; *Jones* v. *United States*, 357 U. S. 493, 497–498; *Chapman* v. *United States*, 365 U. S. 610; *Trupiano* v. *United States*, 334 U. S. 699." [2]

*Coolidge* emphasized that the plain-view doctrine applies only after a lawful search is in progress or the officer was otherwise legally present at the place of the seizure. The initial intrusion must be justified by a warrant, by an exception to the warrant requirement, or by other circumstances authorizing his presence.

If a police officer passing by an open door of a home sees incriminating evidence within the house, his observation may provide probable cause for the issuance of a search warrant. Yet the officer may not enter the home without a warrant unless an exception to the warrant requirement applies. [3] This rule is fully supported by *Coolidge* v. *New Hampshire*, *supra*, and the cases cited in the Court's opinion in that case. [4]

---

[2] One of the many cases cited in *Coolidge* to illustrate this point was *Taylor* v. *United States*, 286 U. S. 1 (1932). The police officers in *Taylor* had looked through a small opening in a garage and had seen cardboard cases inside the garage that they believed contained contraband liquor. The officers could smell the odor of whiskey coming from the garage. Yet this Court held that they had violated the Fourth Amendment by entering the garage and seizing the whiskey without obtaining a warrant.

[3] There is no contention in this case that by entering the dormitory building the officer had already entered respondent's dwelling. The officer himself testified at trial that a dormitory room is considered a "private area" but that the public has access to the hallway. Tr. 37.

[4] *Harris* v. *United States*, 390 U. S. 234 (1968), is not to the contrary. There, an automobile had been impounded and towed to a police station. The windows of the car were open, the doors were unlocked, and it had begun to rain. The Court held that the Fourth Amendment did not require the police officer to obtain a warrant before opening the door of the car to roll up the car window, for this was simply "a measure taken to protect the car while it was in police custody." *Id.*, at 236. *Harris* did not rely on the plain-view doctrine to justify the warrantless intrusion into the

Any contrary rule would severely undercut the protection afforded by the Fourth Amendment, for it is the physical entry of the home that is the chief evil against which the Amend-

---

automobile. The Court emphasized that the police officer had already lawfully entered the car when he saw incriminating evidence in plain view inside the car and seized it:

*"Once the door had lawfully been opened,* the registration card, with the name of the robbery victim on it, was plainly visible. It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Ibid.* (emphasis added).

The broad wording of the second sentence quoted above has apparently created some confusion regarding the plain-view doctrine. One commentator remarked:

"The hardest conceptual problem attending the plain view doctrine is to grasp that it is not a universal statement of the right of a policeman to seize after seeing something in open view; it is rather a limited statement of that right in one of its several instances—following a valid intrusion. . . . The source of difficulty is that the harbinger case, *Harris* v. *United States,* spoke carelessly in universal terms: 'It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure. . . .'

"Seeing something in open view does not, of course, dispose . . . of the problem of crossing constitutionally protected thresholds." Moylan, The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle, 26 Mercer L. Rev. 1047, 1096 (1975).

See also 1 W. LaFave, Search and Seizure § 2.2(a) (1978).

This problem of "crossing constitutionally protected thresholds" without a warrant is easily resolved if the so-called "automobile exception" to the warrant requirement applies, for that exception justifies a warrantless entry into the automobile to seize contraband in plain view inside the car. In *Colorado* v. *Bannister,* 449 U. S. 1 (1980), for example, we held that an officer's observation of items in plain view inside a car did not violate the occupant's Fourth Amendment rights. *Id.,* at 4, n. 4. The officer's observations could therefore be used to establish probable cause to search the car. Yet it was also necessary to justify the warrantless intrusion into the car. We did not seek to justify that intrusion by relying on the plain-view doctrine. Rather, we held that the warrantless entry was justified under the "automobile exception" to the warrant requirement. See *Chambers* v. *Maroney,* 399 U. S. 42 (1970); *Carroll* v. *United States,* 267 U. S. 132 (1925).

ment is directed. *Payton* v. *New York*, 445 U. S. 573, 585–586 (1980); *United States* v. *United States District Court*, 407 U. S. 297, 313 (1972).

The Court does not purport to hold otherwise. There is apparent agreement that the seizure in this case is consistent with the Fourth Amendment only if the officer was legally where he was when he made the seizure. Neither does the Court purport to find that Daugherty's presence in the room was in fact necessary to effectuate the arrest or to protect the officer. To do so would require contradicting Daugherty's own testimony. Rather, the Court asserts that Daugherty *could* have remained at Overdahl's elbow, that he *could* have entered the room wholly apart from his observation of the seeds, and that the case should be judged as though Daugherty had found it necessary to enter the room for the purpose of guarding Overdahl. Under this approach, the officer's presence at the desk where he made the seizure should be deemed lawful.

The difficulty with this is not merely that the officer himself did not suggest that he entered the room to maintain control over Overdahl or to protect himself. The more basic issue is whether the Court is justified in concluding as a matter of law that the circumstances would have warranted an entry for those reasons. The trial court did not sustain the entry on this basis, and the Washington Supreme Court expressly held that there were no exigent circumstances connected with Overdahl's arrest and custody that gave Daugherty sufficient reason to enter the room. I am unwilling on this record to decide as a matter of law what is more properly to be resolved as a matter of fact; and I would not differ with the state court on the record we now have before us.

I perceive no justification for what is in effect a *per se* rule that an officer in Daugherty's circumstances could always enter the room and stay at the arrestee's elbow. This would be true only if there were no limits to the conditions which

the officer could attach when he permits his charge to return to his room. I doubt, for example, that he could insist that he be permitted to search desks, closets, drawers, or cabinets. Likewise, he should not be permitted to invade living quarters any more than is necessary to maintain control and protect himself. Bright-line rules are indeed useful and sometimes necessary, cf. *Pennsylvania* v. *Mimms*, 434 U. S. 106, 109–110 (1977); *United States* v. *Robinson*, 414 U. S. 218, 234–236 (1973), but the Court should move with some care where the home or living quarters are involved.

This is not a case, therefore, involving punishing an officer for entering a room for the wrong reason when there was a perfectly legal basis for his doing so. See *Scott* v. *United States*, 436 U. S. 128, 138 (1978); *Massachusetts* v. *Painten*, 389 U. S. 560, 564–565 (1968) (WHITE, J., dissenting). This is a case where the record before us does not demonstrate that it was necessary for the officer to enter the room as an incident to his custodial arrest. He thus had no legal basis for being in the room unless his sighting of the seeds permitted him to be there. The Court agrees that the plain-view doctrine does not provide that justification.

For me, the case comes down to whether the trial court properly found that the officer's observation from the doorway furnished exigent circumstances for the entry and seizure. The Washington Supreme Court did not review this finding of the trial court, but it should have before setting the conviction aside. I would therefore vacate and remand for this purpose.