473 A.2d 514

**Harold GARRISON**

v.

**STATE of Maryland.**

**No. 818, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 10, 1984.

418

Gerald A. Kroop, Baltimore, with whom were Kroop & Kurland, Baltimore, on brief, for appellant.

Ann E. Singleton, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty., for Baltimore City, and Jamey M. Hochberg, Asst. State's Atty., for Baltimore City, on brief, for appellee.

Argued before WILNER, BLOOM and GETTY, JJ.

GETTY, Judge.

Harold Garrison proceeded to trial on a statement of facts following the denial of a motion to suppress evidence. On March 18, 1983, in the Circuit Court for Baltimore City (Thomas, J.), Garrison was found guilty of possession with intent to distribute heroin and was sentenced to a fifteen year term of confinement. On appeal, appellant raises two issues:

1. Whether the warrantless search of 2036 Park Avenue, Apartment 3F, and the seizure of items therein was legal where the police knew or should have known that appellant's apartment was separate and apart from apartment 3R, for which a search and seizure warrant had been issued?

2. Whether the plain view doctrine legitimized the search of appellant's apartment?

On May 21, 1982, members of the Baltimore City Police Department executed a search warrant for the third floor apartment located at 2036 Park Avenue in Baltimore City. Lawrence McWebb was named in the warrant as the occupant of the premises. The warrant described 2036 Park Avenue as a three story brick dwelling.

The affidavit accompanying the application for a search and seizure warrant recited that McWebb was known as "Red Cross;" that a reliable informant, instrumental in successful prosecutions in eight search and seizure cases, had purchased marijuana from "Red Cross" at his third floor apartment within the previous twenty-four hours; that the affiant, Officer Marcus, checked with the Baltimore Gas & Electric Company and determined the premises at 2036 Park Avenue, third floor, were in the name of Lawrence McWebb; and that records of the Baltimore City Police Department confirmed that McWebb resided at that address.

The warrant authorized the search of McWebb and of the premises "known as 2036 Park Avenue third floor apartment." The property authorized to be seized included "Mar-

ijuana, related paraphernalia, monies, books, papers and photographs pertaining to the illegal distribution of marijuana."

The testimony of three police officers involved in the search must be recounted for a full understanding of what took place on May 21 at the premises.

The infallibility of hindsight establishes that the police searched the right (McWebb's) and the wrong (Garrison's) premises. The difficulty arises in determining whether the warrantless Garrison search is sustainable despite the acknowledged mistake. We turn now to the testimony of Officers Russell Shea, Albert Marcus and Joseph Schanken.

Detective Shea testified that the front door to the premises was locked when the six officers arrived. He observed seven mail box slots with names, but none with the name "McWebb." A forced entry was unnecessary, because McWebb drove up to the house and another officer advised him of the warrant. McWebb then unlocked the front door and the six officers present entered into the first floor hallway.

Without stopping, the entire group proceeded up the stairs to the third floor. The locked door at the top of the stairs was opened by McWebb, permitting the police to enter into a foyer with rooms to the left and to the right. According to Shea, immediately upon entering the third floor he observed a man (Garrison), in a body cast and a pajama top, standing to the right side of the foyer. Shea testified that he did not observe any closed doors to his right or to his left. He did notice, from a distance of five feet, loose marijuana on a newspaper located on a dresser inside a doorway behind where Garrison was standing. The officers split up to conduct the search. Shea went to his left and began searching what was later established to be McWebb's bedroom. He recovered a revolver, marijuana, and two electric bills, one addressed to McWebb and the other to Garrison. He did not notice at the time, according to his account, that one of the utility bills was marked "3F" and the other "3R."

Shea then proceeded across the open foyer through an open doorway to a bedroom on the right side of the third floor entrance. He observed clothing hanging on the door which was opened back to the interior wall and, upon examination, found in the pockets of a jacket, syringes, a cap used for cooking heroin and five bundles of currency totaling $4,940.00. Shea then noticed that the door had a dead bolt lock. Sergeant Schanken, who was also present, observed that the door to the left of the hallway had a similar lock. Schanken then ordered the search stopped, because it appeared that two apartments were involved. Shea maintained that all of the interior doors on the third floor were open when the police entered and that none of the doors had numbers identifying separate apartments.

Officer Marcus, based upon information supplied by an informant, prepared the warrant. The Baltimore Gas & Electric Company, Marcus stated, advised him that the third floor tenant was Lawrence McWebb. McWebb was accosted by Marcus outside of the building and ordered to unlock the front door and the door located at the top of the stairs on the third floor. Upon entering the third floor, Marcus observed a quantity of marijuana on a dresser in a room to his right and immediately proceeded into that area to seize the contraband. He, like Shea, placed Garrison in the foyer. Marcus recovered narcotics from several dressers in Garrison's room before he was advised by Sergeant Schanken to discontinue the search. In preparing the inventory, Marcus did not separate the property taken on a room by room basis.

Detective Schanken was the officer in charge during the search. He saw Garrison when the officers entered and directed him to go into the (McWebb) living room. Neither Garrison nor McWebb, according to Schanken, stated that the third floor contained separate apartments. In walking through the rooms while the search was in progress, Schanken saw two kitchens and two bathrooms and then halted the search.

Appellant Garrison testified that he was not in the hall-
way as testified to by the police, but remained in his
apartment doorway with a police officer present. When the
search of McWebb's apartment was completed, Garrison
testified, he was taken to McWebb's living room while his
apartment was searched. He had lived in the apartment
since 1979 and McWebb moved in across the hall in 1981.
Garrison asked one of the officers present, "What's going on
man?" The only response he received was that another
officer was directed to "watch me." Contrary to the testi-
mony of the three police officers, Garrison insists that the
apartments are designated "3F" and "3R" by lettering on
the door jambs inside the third floor foyer.[1] Garrison also
contended that it was physically impossible to enter the
foyer and see into his bedroom, because the door opening
into the foyer opened to the right obscuring any view into
the bedroom until the common door was closed.

McWebb's testimony corroborated Garrison's account of
the entire episode. He added that he told Marcus that he
lived in the "third floor rear" apartment. Based upon the
conflicting testimony the trial court made the following
findings of fact:

THE COURT:

Yes. Now, the Defendant McWebb contends again that
it was a general warrant. Now, Defendant argued that
argument. That is the police knew or should have known
that the Garrison apartment was separate and distinct
from the apartment of the Defendant McWebb. He fur-
ther characterizes the testimony of police as perjured or
unworthy of belief.

Now, the Court, based on what it finds to be critical
evidence, makes the following findings of facts: One, that
on May 21st, 1982, the police executed a search and seizure
warrant for premises at 2036 Park Avenue, third floor
apartment. Two, the police had reliable information to

---

1. Photographs taken after the incident support this contention.

believe the Defendant McWebb resided in a third floor apartment, did not know of another apartment on the third floor.  Now, while it was evidence that there were a number of apartments in the building, police were unaware where these apartments were located or the character of the building.

Three, the Defendant McWebb was detained outside of 2036 Park Avenue.  With the keys furnished by him, the police gained entrance through a locked front door to the building, next to the door were seven mail boxes with bells, or indicating were bells under each mail box, but no names were reflected on any of the mail boxes.  Further, McWebb's name was not visible on any of the mail boxes or any area adjacent thereto.

Next, the police were directed to the third floor by McWebb without any notice or knowledge of the layout of that area.  Five, that entrance to the third floor was gained through a common marked door which gave no indication that there was more than one apartment located on said floor.  There was no one to alert anyone to indicate that there were more than one apartment.

Next, that upon opening said door, police found the Defendant Garrison standing in his night clothes.  Next, seven, upon entrance to the third floor, police saw an open door to the left later identified as McWebb's apartment, and also an open door to the right later identified as Garrison's apartment.  In fact, no door was visible at the time the police entered and the police were unaware at that time that there were two apartments.

Eight, that from the position of the hallway area leading to the two apartments, the police saw and based on their expertise located on top of the dresser in an open room to the right, a quantity of marijuana.  Entrance was made into that room later identified as the apartment of the Defendant Garrison where a police or the police found over the front door or the door leading to that area articles of men's clothing.

No numbers were observed by police upon entering the apartment which would alert them to a separate apartment. The room was searched, and in the apartment of the Defendant Garrison was recovered a quantity of heroin and approximately four thousand dollars in cash.

Nine, also significant or significantly at the time, neither defendant Garrison nor Defendant McWebb indicated that there were two separate apartments on the third floor. Ten, that a copy of the search and seizure warrant was given to the Defendant McWebb. The inventory listed all the evidence seized from both apartments without indicating which pieces of evidence were found in each location. Eleven, it is clear that there was a common door which could be opened at the time of the search affording access between the two apartments.

The evidence indicates that while each apartment or the occupant of each apartment could have privacy by locking this door, nevertheless, there was free access judging from all the evidence at the time the police arrived there between the two apartments, and that the Defendants so intended based on the evidence that has been submitted before me.

Now, first with respect to the inventory, the inventory related duties which must be carried out upon execution of a warrant under Maryland Rule 780 are considered ministerial. And assuming the search was valid and the entry was lawful, a failure to comply completely with such ministerial duties does not render the warrant defective. In this case it is clear what was taken as regarded to the inventory and the potential property rights of each of the parties who may be affected or protected.

Now, with respect to the search and seizure warrant. The general rule regarding the searches of multiple units for the purpose of satisfying the Fourth Amendment, searching two or more apartments in the same building, is no different than searching two or more completely separate houses. Probable cause must be shown for searching each house, or as the case may be, each apartment. How-

ever, there is an exception to this general rule where the multiple unit character of the premises is not externally apparent and is not known to the officer applying for or executing the warrant.

It is clear that the warrant specified the premises to be searched as the third floor apartment of the Defendant McWebb, that the officers did not know that there was more than one apartment on the third floor and nothing alerted them of such a fact until after the search had been made and the items were searched. In view of these findings, the Court will deny the motion of each Defendant to suppress the evidence. All right.

■ As a reviewing court, we are obliged to accord due deference to the trial judge who, having seen and heard the witnesses, has a superior opportunity to determine the credibility of the witnesses, and to resolve contradictions in first line facts. *Watson v. State,* 35 Md.App. 381, 370 A.2d 1149 (1977); *Fidazzo v. State,* 32 Md.App. 590, 363 A.2d 583 (1976); Maryland Rule 1086. It is clear from the trial judge's factual summary that he believed the police version of what took place and rejected the contradictory testimony of McWebb and Garrison. Under *Watson, supra,* he was authorized to make that judgment.

The balance sheet on what the police knew, or by the exercise of reasonable diligence should have known, required careful consideration of the following factors:

1. The police knew an apartment building was involved; they saw seven mail boxes at the entrance to a three story building.

2. They reasonably concluded that McWebb occupied the entire third floor; Baltimore Gas & Electric stated that 2036 Park Avenue had service listed to McWebb, police records established that he lived at that address on the third floor.

3. No attempt was made to determine Garrison's status when he was first observed in the foyer; Garrison

didn't say he had a separate apartment, but the police didn't make any inquiry concerning him.

4. The police answered Garrison's phone and the caller asked for "Red Cross," McWebb's street name.

5. Utility bills recovered in McWebb's apartment were addressed to McWebb and to Garrison, designated as "3F" and "3R"; the police didn't notice the distinction at the time.

6. McWebb made no mention of Garrison or his separate quarters. The trial judge did not believe that McWebb said he lived in "the rear."

7. All of the doors, left and right, inside the foyer were open; the court so found in assessing credibility.

8. The immediate examination of the premises for safety purposes disclosed that no one else was present; with McWebb and Garrison in custody, no exigency existed that precluded an orderly, systematic evaluation of the circumstances incident to the execution of the warrant.

Under these circumstances, is the search of Garrison's apartment sustainable?

■ Ordinarily, probable cause will not justify a warrantless entry into fixed premises. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Steele v. United States,* 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925); *Brown v. State,* 15 Md.App. 584, 292 A.2d 762 (1972); Gilbert and Moylan, *Maryland Criminal Law: Practice and Procedure,* "The Plain View Doctrine," Ch. 34, Sec. 34.11. "Police agents, standing where they have a right to be, observing contraband in 'plain view' within fixed premises are not thereby justified in making an immediate entry and seizure; a warrant is still necessary." *Coolidge, supra,* 403 U.S. at 468, 91 S.Ct. at 2039. In the present case, the police were lawfully within the third floor premises, at least to the extent of the foyer. The warrantless search of Garrison's apartment, however, may not be sustained unless the facts

accepted by the court fall within some recognized exception to the warrant requirement.

Search warrants directed against multiple occupancy structures are generally held to be invalid where the warrant fails to describe the subunit with that degree of particularity that precludes the search of other units within the building. Exceptions to the general rule include common occupancy, entire premises as suspect, and multi-unit character of premises not known or apparent. *Minovitz v. United States,* 298 F.2d 682 (D.C.1962); 11 A.L.R.3d 1330. In this case we are concerned with the third exception; to wit, what the police knew or should have known.

In *Thomas v. State,* 50 Md.App. 286, 437 A.2d 678 (1981), we upheld the sufficiency of a warrant against an allegation that where an eleven story complex was involved and appellant's name was not included, the warrant was too general. A charge that a warrant is not specific is the equivalent of stating that by due diligence the police knew, or should have known, that separate units were located at the premises to be searched.

We said that Maryland law required no greater specificity than that the warrant shall name or describe with reasonable particularity the building, apartment, premises or place to be searched. The police in *Thomas* did not conduct an indiscriminate search, but located the proper apartment and conducted the search. *Accord, Butler v. State,* 19 Md.App. 601, 313 A.2d 554 (1974), appellant rented room in a multi-unit building which he used as a "stash house." *See also, United States v. Santore,* 290 F.2d 51 (2d Cir.1960), cert. denied, 365 U.S. 834, 81 S.Ct. 745, 5 L.Ed.2d 743 (1961).

We emphasized in *Harris and Schmitt v. State,* 17 Md. App. 484, 302 A.2d 655 (1973), that there is no formula for measuring particularity in describing premises subject to search; the adequacy depends on the facts and circumstances of each case. The State cites two decisions of this Court

that allegedly support, in principle, the legality of the search of Garrison's premises.[2] In *Delly,* the police were unaware that the house was a multi-family dwelling. Nothing was taken from the unoccupied apartments; the only evidence introduced came from appellant's quarters. Due to the outward appearance of the house, the police had no indication that more than one family unit occupied the premises. The Court, therefore, upheld the validity of the warrant, despite the fact that the officers searched premises other than appellant's.

The search warrant in *Green* was for the defendant and her apartment. The affidavit mistakenly referred to the apartment as being on the second floor. After discovering the error, the police entered the first floor apartment occupied by the defendant and carried out the search. The warrant was upheld. Unlike either *Delly* or *Green,* however, the search and seizure herein included *both* apartments. The facts found by the court in the present case, however, are sufficient to establish that the police had no reason to believe that the third floor contained more than one apartment. One locked door without any identifying numbers provided entry to the third floor. Several open doors immediately within revealed a living room to the left and a bedroom to the right. Baltimore Gas & Electric verification indicated one apartment. Appellant's assertion that seven mail boxes in a three story building is notice that more than one apartment is located on the third floor is pure speculation. Any combination of units is possible. One may require the police to be observant and to act reasonably; clairvoyance, however, is not required.

Several cases from other jurisdictions are instructive on the issue of multiunit premises not apparent. In *People v. Kinnebrew,* 75 Mich.App. 81, 254 N.W.2d 662 (1977), the

---

**2.** *Delly v. State,* 30 Md.App. 391, 352 A.2d 331 (1976); *Green v. State,* 38 Md.App. 63, 379 A.2d 428 (1977).

Michigan Constitution, like Maryland's,[3] provided that warrants shall not issue without "particularly describing the place to be searched." The police informant purchased drugs in the upstairs apartment from an individual who had not been apprehended. The police were under the impression that the building was a single family unit. In executing the warrant the police discovered the defendant and the evidence in the downstairs apartment. The affidavit submitted in support of the request for the warrant made no mention of any downstairs activity. Acknowledging that the warrant was not sufficiently specific, the Michigan Court said:

> "In cases where the police were understandably misled that a house was a single dwelling unit, the courts have recognized an exception to the rule that evidence must be suppressed if the search warrant did not adequately describe the premises to be searched. The crucial inquiry in this type of case is whether the police made a good faith effort to accurately describe the premises."[4]

The exception to the general rule was recognized in *People of the State of Colorado v. McGill and Reiter,* 187 Colo. 85, 528 P.2d 386 (1974), stating:

> "The fact that the police learned that the house was being used for multiple occupancy purposes after they gained entrance to the premises does not alter our conclu-

---

**3.** Md. Constitution, Art. 26: That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place or the person in special, are illegal, and ought not to be granted.

**4.** The Court cited cases collected in § 8 of the annotation in 11 A.L.R.3d 1330 as expressing the majority view that:

"Absent a finding by the trial court that the police officers *knew* or *should have known* when they obtained the search warrant that the building involved was multi-unit in character, the warrant and resultant search and seizure have been held to be constitutionally permissible." *People v. Johnson,* 49 Misc.2d 244, 267 N.Y.S.2d 301 (1966).

sion (of constitutionality). When the police executed the warrant and discovered that the building was not a single family residence, they did not have to abandon their search and obtain a new warrant. The police procedure, in this case, was reasonable in view of the exigent circumstances. Had they elected to delay their search to obtain an amended warrant, they would have jeopardized the search and the loss of evidence of narcotics which are easily destroyed."

■ Search warrants need not be read with all the precision of a pedantic grammarian. We hold that the facts relied upon by the trial judge were sufficient to support his conclusion that the police could not reasonably have determined, prior to their entry, that the third floor at 2036 Park Avenue contained more than one apartment. The warrant, therefore, was not constitutionally defective.

■ Appellant's second contention is that "plain view," conceding the legality of the entry, will not justify the search of and seizure from Garrison's apartment. Appellant relies on our decision in *Brown v. State,* 15 Md.App. 584, 292 A.2d 762 (1972), which is a scholarly and comprehensive history of the doctrine articulated by Judge Moylan. The bottom line in *Brown* is "with respect to fixed premises, no amount of probable cause will justify an intrusion." Brown was arrested for theft, he declined a request by the officers present to search his residence. The police then proceeded to the home of Brown's landlady for the purpose of obtaining a description of the premises in order to obtain a search warrant. The landlady invited the officers into her home, and, pointing to an open door, said, "There's the room where Willie lives." From the hallway, a deputy sheriff saw a box in which he could see "in plain view" the stolen property. Without walking into the room, he reached in and seized the box and contents.

We said that there was no prior valid intrusion into Brown's room and, therefore, Brown's Fourth Amendment rights were violated. The police were on the outside looking

in and, while they had a right to look, they had no corresponding right to enter and/or seize. We turn now to a consideration of *Brown* in light of the Supreme Court decision in *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982).

A university police officer stopped a student, Chrisman, who appeared to be underage and who was carrying a bottle of gin. When he was asked for identification, Chrisman said he could get the information from his room. The officer accompanied him and while standing in the doorway he observed a pipe and what he believed to be marijuana seeds on a desk in the room. The officer entered the room, confirmed that the seeds were marijuana and that the pipe smelled of marijuana. Chrisman and his roommate were advised of their rights, which they waived, and the roommate, when asked if other drugs were in the room, produced additional marijuana and cash. The students consented to a search of their room which yielded a quantity of lysergic acid diethylamide (LSD). The roommate was convicted of possession of controlled dangerous substances following a denial of a suppression motion.

A divided Court held:

1.  It is not unreasonable for a police officer, under the Fourth Amendment, as a matter of routine, to monitor the movements of an arrested person as his judgment dictates following an arrest;

2.  Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested, and accordingly the officer could, consistent with the Fourth Amendment, accompany the student to his dormitory room and enter the room upon observing suspected contraband in plain view, such entry from a public corridor not requiring a showing of exigent circumstances; and

3.  The Fourth Amendment did not prohibit the seizure of the contraband which was in plain view, it being of no legal significance whether the officer was in the room,

on the threshold, or in the hallway at the time he observed the contraband, since he had a right to be in any of these places as an incident of a valid arrest.

In dissenting, Justice White (joined by Justice Brennan and Justice Marshall) said the officer could only enter the residence of the arrested person to protect himself or to maintain control over the arrestee, and where the officer entered solely to confirm his suspicion relating to contraband therein, the Fourth Amendment rights of the arrestees were violated.

At first blush, the Court's opinion (Burger, C.J.) would seem to overrule *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), holding that plain view alone is never enough to justify the warrantless seizure of evidence. A more careful reading of the opinion, however, leads us to conclude that the sighting of the marijuana in plain view did not form the basis for the Court's conclusion that the seizure was justified. Rather, the Court construed the seizure to be proper for the reason that the officer had a right to be in the room with the arrestee and it was, therefore, not relevant that his observation was made from the doorway. The initial intrusion being valid, the later "plain view" seizure and consent search did not violate the arrestee's Fourth Amendment rights. We decide, therefore, that neither *Coolidge* nor *Brown* are overruled by *Chrisman.*[5]

We recognize that the resolution of the present case cannot rest upon the fact that Garrison was unquestionably engaged in drug trafficking. Neither may we sanction a warrantless search of premises in violation of the Fourth Amendment. The trial court decided that "there was free access between the two apartments ... and that the defendants so intended." The evidence to support that conclusion is that after gaining entrance to the third floor all the

---

5. Neither the Supreme Court of the State of Washington nor the Supreme Court of the United States engaged in a discussion of "exigent circumstances" in deciding *Chrisman.*

doors were open, Garrison was standing in the foyer, marijuana was visible in the room behind him, a phone call received in one of Garrison's rooms was intended for McWebb, no separate apartment numbers were visible, Garrison's utility bill was in McWebb's quarters, and no one present advised the police that the apartments were separate. Garrison was immediately placed in custody and taken to a room with McWebb. The seizure of the marijuana at that point was incident to a lawful arrest.

This case does not present the usual common use involving separate bedrooms and a single kitchen and bath (*People v. Gorg,* 157 Cal.App.2d 515, 321 P.2d 143 (1958)); or two family occupancy where defendant is head of the household (*Sparks v. State,* 77 Okl.Cr. 431, 142 P.2d 379 (1943)). The court in the present case, we decide, could reasonably conclude that both persons seemed to be making themselves at home throughout the third floor. We are not unmindful of the fact that appellant accused the police of lying and distorting what appellant alleges to be the true facts. Credibility of the witnesses, however, is within the province of the trial court and not an appellant tribunal.

Upon the peculiar facts of this case, we hold that the trial court was not clearly erroneous in concluding:

1. That the police could not reasonably have discovered, prior to the time that the search was conducted and the contraband was observed and seized, that the third floor contained two separate apartments; and

2. That despite the designation of the third floor premises as "3F" and "3R," McWebb and Garrison treated the third floor as one apartment in common use.

The resulting search and seizure of the entire premises, therefore, do not violate appellant's Fourth Amendment rights. This decision does no violence to *Brown, supra,* which we recognize is still good law in Maryland.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.