UNITED STATES of America, Plaintiff,

v.

James R. MARTIN, Defendant.

No. LR–CR–86–7.

United States District Court,
E.D. Arkansas, W.D.

June 10, 1986.

Terry L. Derden, Asst. U.S. Atty., Organized Crime Drug Enforcement Task Force, Little Rock, Ark., for plaintiff.

Hugh Culverhouse, Jr., Miami, Fla., for defendant.

## FINDINGS AND CONCLUSIONS AFTER HEARING ON MOTION TO SUPPRESS

EISELE, Chief Judge.

The defendant has moved to suppress certain evidence which was obtained by government agents from the defendant's house on two separate occasions, April 10, 1985, and January 31, 1986. The defendant was arrested on both occasions.

### Background

Special Agent Jack Hook of the DEA's Miami Office received information from Agent Carver of Little Rock that a confidential informant by the name of Brown would be coming into Miami with a David Barrow from Arkansas to obtain one kilo of cocaine. Agent Carver provided the flight number and requested surveillance. Officer Hook was informed that Agent Carver believed that Brown and Barrow would attempt to purchase the cocaine from defendant James Martin in Penbroke Park, Florida. Agent Hook observed the arrival of Brown and Barrow. He observed as they rented a car from Budget Rent-a-Car and drove to a Ramada Inn. He observed their leaving the Ramada Inn and driving north. At one point he lost Brown and Barrow in the traffic so he drove directly and quickly to the residence of James Martin. A few minutes later, Brown and Barrow arrived and went into the defendant's residence without anything in their hands. They were there from 20–30 minutes and then came out with a package. Barrow put the package under the front seat and he and Brown then drove to the Ramada Inn and left again heading north to Fort Lauderdale. After they got on the Florida Turnpike, the officers stopped them and arrested Barrow, seizing the one kilo of cocaine. This arrest occurred early in the night of April 5, 1985.

The officers obtained a statement from Brown. Brown stated that when he and Barrow went into defendant Martin's residence, Brown and Martin went into the bedroom where Martin obtained the kilo of cocaine from the lower dresser drawer and gave it to Brown. Brown gave Martin $4,000 which he had obtained from Barrow. Brown stated that Barrow had received a telephone call from Martin on April 8 suggesting that he come to his, Martin's, residence "to make some money." Brown stated that Martin told him that Barrow would owe him $41,000 more which was to be paid

after the cocaine was sold in Arkansas. At some point, Brown informed the DEA agents that Martin had a shotgun and that he also kept some kind of a notebook or diary of his drug transactions.

Agent Carver also told Agent Hook about recorded telephone conversations between Brown and Martin.

Upon the basis of the above facts, Officer Hook and his fellow officers felt they had reasonable cause to arrest defendant Martin that night for the conspiracy and possession of cocaine. The Court agrees.

### April 10, 1985 Arrest

Agents Hook, Harper, Davis and Rice, with three or four uniformed officers of the Sheriff's Department, went to the defendant Martin's home at approximately 1:30 a.m. on April 10, 1985. Officers Hook, Rice and Harper knocked at the front door while the others observed the rear and sides of the house. The door was partially opened and the officers could see the heads of two persons. They asked for James Martin and the defendant identified himself and opened the door more fully. The officers had their weapons drawn at the time. The defendant was naked. Officer Hook told Martin that he was under arrest for conspiracy and the possession of cocaine. The defendant indicated a desire to go to his bedroom to get dressed. The officers agreed.

Some of the other officers, who had entered the house immediately after Hook had placed the defendant under arrest, made a quick "sweep" of the entire house to determine who else might be present. However, no search for evidence was conducted and no evidentiary items were identified or taken before the defendant went into his bedroom with the officers.

In the bedroom, Officer Hooks first observed a woman lying face down on the bed. Before coming to the house he had been told that Martin had a shotgun, so he asked him where it was. Martin answered that it was in the closet. The officers thereupon looked in the closet and found Gov. Exh. A, the shotgun. Then Officer

Hook asked the defendant if there were any other guns and Martin pointed to the nightstand on the right side of the bed. Officer Hook opened the drawer in the nightstand and found Gov. Exh. B, a loaded .45 caliber revolver with six shells in it. He also noted Gov. Exh. C, a small amount of what appeared to be marijuana, in a small plastic bag, in open view on the top of the nightstand.

Officer Hook testified that the defendant requested underwear to put on and he responded to the request by pointing to a pair of underwear on the floor. He testified that the defendant asked for clean underwear and stated that it would be found in the top drawer of the tall chest of drawers. As the officer was removing the underwear, he observed several piles of U.S. currency which turned out to total $27,000. See photo, Gov. Exh. D. Of course, Officer Hook was aware of the $4,000 transaction that had occurred in the house a little earlier in the evening. And he surmised that the cash used for the $4,000 transaction would be found as part of the $27,000. He therefore seized the cash. And, on top of that dresser, in open view, he found $1,662 more in cash.

The Court has difficulty with the government's testimony that the defendant refused to put on the dirty underwear that was on the floor and, instead, requested the officer to get clean underwear out of the top drawer when he obviously knew it contained $27,000 in cash. Still, the Court is convinced by the evidence that the officers did not search through the drawers in the dressers. The defendant testified that the officers laid out clothes for him to wear and simply put the underwear on top of those clothes. The Court finds that it is more probably true that the following occurred: When the defendant expressed a desire to be permitted to dress, the officers took the necessary clothes from the closet and the drawer. In the process of getting the underwear from the top drawer of the dresser, the officer noticed the money. The Court so finds, believing that this factual picture is more likely true than that

testified to by either party and yet is firmly grounded on the evidence as a whole. The $27,000 was inadvertently found by Officer Hook as he went about getting for the defendant the clothes he needed and had requested.

The officers, as indicated, pulled out various items of clothes from the closet until the defendant identified the clothing that would fit him and that he wanted to wear. The defendant then got dressed. On the way out of the room Officer Hook noticed a brown ledger book on top of the wicker "foot locker" located at the foot of the bed. He took it because of his general knowledge, gained from his experience as a drug enforcement agent, that drug dealers usually keep written records of their transactions. But he also had specific information that Martin kept a diary or a ledger book which he described as "a regular notebook."

The defendant was not read his Miranda rights until he was placed in the car to be taken to the detention center. The defendant did not give the officers any consent to conduct a formal general search. But the Court is convinced the defendant knew his rights from previous experience even though he testified that, "Maybe I forgot them." And he expressed his desire to get dressed (even though he states "I had no alternative"); did lead the officers into his bedroom; and did voluntarily advise the officers where the shotgun and the pistol were located. The Court discredits the defendant's testimony that some officer first went into the master bedroom and reported, "It's all right in here but I can't find it," suggesting a prior search for the shotgun. There is nothing to suggest that the officers would have had any difficulty locating the shotgun in the closet if they had been searching for same.

The Court discredits the defendant's testimony suggesting that the officers conducted a general search of the house. Nothing was discovered or seized before the defendant was permitted to go into his bedroom to dress. And nothing was taken that was not located in the bedroom. The Court discredits the testimony of the defendant that his papers—and, assumedly, the brown ledger book—were not out in the open but were kept in a briefcase which the officers opened and searched. Apparently the defendant, by such testimony, was intending to state that the agents did this on *both* April 10, 1985, and on January 31, 1986. See below. As indicated above, the Court finds that the brown "ledger-type" book was found in open view on top of the wicker foot-locker. However, the Court further finds that the book is nondescript in appearance and would suggest nothing to a lay-person as to its possible contents. Further, as found above, Officer Hook knew of the existence of some book or diary that Martin was supposed to have in the house. But the Court further finds that none of the officers searched for this item and the Court credits Officer Hook's testimony that he was not looking for it when he found it. Rather he inadvertently noticed it as he was leaving the defendant's bedroom.

*January 31, 1986 Incident*

Officer Jack Hook received a copy of the grand jury indictment in this case and an arrest warrant from this court together with a request from Arkansas that the Miami DEA officers arrest the defendant James R. Martin. Officer Hook, Officer Mike Myrick and Officer Mizella, along with two or three uniformed deputy sheriffs went to the defendant's residence between 8:00 and 9:00 a.m. on January 31, 1986. Officer Myrick, as the leader of the team, arrived on the scene first, around 8:00 a.m. He observed defendant's residence. There were two cars in the driveway. Around 8:15 a.m., a woman exited the house and drove off. The other DEA officers arrived around 8:30 a.m. and they radioed for the uniformed deputies. At around 9:00 a.m., Officer Hook, Myrick and one of the uniformed deputies went to the front door while Officer Mizella and the others went to the rear and the sides of the house. Myrick or Hook knocked on the front door and the defendant Martin answered. He had a bathrobe on and his dog,

a doberman, was with him. The officers informed Martin that he was being arrested pursuant to the Arkansas arrest warrant and asked him to put his dog outside in the back yard, which he did. Other officers who had been outside came into the house and a "sweep" was made to determine if anyone else was in the house. It turned out that no one else was there. At that time, the defendant went into the bedroom with Officers Myrick and Hook so that Martin could get dressed. Officer Hook asked if the defendant had a gun and the defendant replied, "yes, in the night stand," which was located on the right side of the bed. Officer Hook opened the drawer to the night stand and found a 9mm. Smith and Wesson (Gov. Exh. F). He also found inside the drawer $18,000 in cash, separated into increments of $1,000 with rubber bands or paper money fasteners. The items in the drawer were in disarray. The money was against the front wall of the drawer on top of a Rolex watch which was in a box. The gun was further in, but was also on top where it could be seen.

The officers also found papers and records, a notebook and telephone book on top of the two dressers located in the bedroom. They also found telephone digital beepers and cellular telephones and a charger therefor. All of these items were in plain view of the officers. Another $800 in cash and another Rolex watch were also found on top of the taller dresser.

Two of the items found in open view were the handwritten documents identified as Gov. Exhs. G and H. These items clearly appear to be a code of some type, one in English and the other in Spanish and contain references to "VOR," "LAT," "LONG," "degrees," "AM," "PM," "ARRIVES," "LEAVES," "Kg.," "Phone," and "plane," coupled with what appear to be code words therefor.

Gov. Exh. I is a black leather folder containing a "weekly reminder" calendar and a "phone address" book with alphabetical tabs for names and telephone numbers was found on top of the lower dresser. The book was closed at the time it was found. When closed, it is impossible to know the nature of its contents. Officer Hook testified that from his experience as a drug law enforcement officer he was aware that drug dealers usually kept records of their customers and contacts. He assumed the black folder contained such information.

Gov. Exh. J is a spiral notebook with one of its cardboard covers remaining. It was found on top of the high dresser along with Gov. Exhs. G and H. It was face up with the first page containing the word "levis" at the top left and then two columns of figures ranging from 20,000 to 1,156,000.

While the defendant was getting dressed, Officer Myrick observed the butt of an AK assault weapon protruding slightly from beneath the bed. See Gov. Exh. K. It had a loaded clip in the chamber and two additional clips taped to it. When Officer Myrick found the gun, the defendant stated he had forgotten about the rifle.

The defendant was taken outside. He was given a receipt for the items that were taken and was read his "rights" after he was put in the car to be taken to the detention center.

All items taken from the defendant on January 31, 1986, came from his master bedroom. Although the officer looked in the various closets, they did not open any other drawers than the one identified above.

### General Comments

The defendant testified at the suppression hearing and impresses the Court as intelligent and quite sophisticated. His attorneys argue the improbability of his acting the same way on both April 10, 1985, and January 31, 1986, as essentially testified to by the Government's witnesses. They ask why he would lead the agents in both instances into discovering very damaging evidence against him. But the improbability of the defendant's actions based on his perceived self interest may depend upon the degree of his sophistication about the ways of the law. Perhaps he was

aware that if the officers did not learn of such evidence at the time of the arrest they could secure the house and later obtain a search warrant and then easily discover such items. Certainly this was the case on January 31, 1986. (During the incident on April 10, 1986, securing the property would have been more difficult because of the presence of the woman and the other man.) And it is of course true that the government could have avoided this issue altogether by obtaining search warrants before going to the house to make the arrests. The Court must deal with the case as it finds it. Regardless of the peculiarity of some of defendant's actions and responses, the Court is convinced that the factual pictures of the two incidents are as set forth and found above. It has made its Finding of Fact based upon the evidence and must now apply the law to those facts to determine which, if any, of the items obtained by the agents on April 10, 1985, and on January 31, 1986, should be suppressed.

### Conclusions of Law

█ Under the facts of this case, as stated above, the officers after arresting Mr. Martin, had a right to accompany him into his bedroom on both occasions to supervise his getting dressed. *See Washington v. Chrisman,* 455 U.S. 1, 6–7, 102 S.Ct. 812, 816–17, 70 L.Ed.2d 778 (1982) and *U.S. v. Apker,* 705 F.2d 293, 306 (8th Cir.1983). The initial intrusion which brought the officers into Mr. Martin's bedroom was therefore lawful being incident to the arrest and Martin's expressed desire, and need, to get dressed. After entering the room the officers inadvertently came across certain immediately apparent evidence which lay about the room in clear view. Once the officers were lawfully in the bedroom, any readily apparent evidence within "plain view" could be lawfully seized. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Whether such evidence is or is not in the area of the arrestee's immediate control does not matter so long as the item is in "plain view." *Id.* at 465–71 & n. 24, 91 S.Ct. at 2037–40 & n. 24 (1971).

On the basis of such rationales, Gov. Exh. C, the marijuana; the $1,662 in cash found on the top of the tall dresser on April 10, 1985; the $800 similarly found on January 31, 1986; Gov. Exhs. G and H, the handwritten "code" sheets; Gov. Exh. J, the spiral notebook without one cover; and Gov. Exh. K, the AK assault rifle with additional clips, will not be suppressed.

█ Two of the three guns—Gov. Exh. A (the shotgun) and Exh. B (the .45 caliber loaded revolver)—were found during the events incident to the April 10, 1985, arrest. There is nothing in the evidence to indicate that they were really hidden. The shotgun was in the closet and the pistol was in the drawer in the nightstand. Each would be readily apparent to anyone looking into the closet or the drawer. Here, Officer Hook asked the defendant where the shotgun was located and was told, and then asked if there were any other weapons, to which the defendant responded that there was one in the drawer in the nightstand. Essentially the same scenario occurred on January 31, 1986, with respect to the discovery of the 9 mm. Smith and Wesson (Gov. Exh. F). The officers having lawfully entered the defendant's bedroom with him, could have lawfully looked for weapons within the immediate area under accepted principles. *See U.S. v. Palumbo,* 735 F.2d 1095, 1097 (8th Cir.1984). Instead, they inquired about the presence of weapons. A similar situation occurred in *U.S. v. Roper,* 681 F.2d 1354 (11th Cir.1982) where the defendant was asked if he had any weapons and replied that a handgun was in an unlocked metal briefcase on top of the dresser. The Eleventh Circuit stated:

> "There is no necessity to address the purported infringement of Roper's Fourth and Fifth Amendment rights because we find that the search of the briefcase and shoulder bag were incident to his arrest and even if the search was tainted the evidence is admissible under the 'inevitable discovery' exception to the 'fruit of the poisonous tree' doctrine."

The Court concludes that the shotgun, the .45 caliber pistol and the 9 mm. Smith and Wesson should not be suppressed.

 The Court concludes that the $27,000 in cash found in the top dresser drawer on April 10, 1985, and the $18,000 in cash found in the drawer of the nightstand on January 31, 1986, were inadvertently discovered by the officers while lawfully looking into those drawers for other purposes, i.e., to obtain underwear for the defendant and in looking for the gun the defendant told them was in the nightstand. Therefore, this money will not be suppressed. The status of the brown notebook or ledger (Gov. Exh. E) found lying on top of the wicker foot locker is not so clear. The officer, based upon his expertise in dealing with drug-related crimes, states that drug dealers routinely keep written records of their transactions. Furthermore, Officer Hook knew from statements made by the confidential informant Brown that Martin kept such a record or diary although same was not described. The brown ledger book is nondescript. There is no writing on either cover. There is nothing to suggest to a lay person that it is evidence. In *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), it is pointed out that the "plain view" rule "is legitimate only where it is immediately apparent to the police that they have evidence before them;" although in some instances the practiced eye of the police officer may recognize something as evidence that a lay person would not, here the expert is only suspicious that the book might contain evidence. And such notebooks are often kept by law abiding citizens. The Court concludes that the brown ledger book must be suppressed. This is also true of the black folder containing the weekly reminder calendar (Gov. Exh. I). It will therefore also be suppressed.

The Supreme Court recently interpreted the *Coolidge* requirement that items seized because they are within "plain view" must have an "immediately apparent" evidentiary value. *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In *Brown*, the Court reaffirmed the notion first expressed in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that the seizure of evidence in "plain view" requires "probable cause" that the items involve criminal activity. The Court rejected the idea that the "immediately apparent" standard requires the seizing officer to "know" the item's evidentiary value. *Id.*, 100 S.Ct. at 1371. Nevertheless, there must be something more than a possibility of the item containing evidentiary value. Although it may be true that drug dealers often maintain records of their illicit contacts and transactions within such documents as Gov. Exhs. H and I, many people who do not buy or sell drugs also have similar calendars or notebooks around their homes. The mere presence of such an item is therefore no indication of any drug activity. While these items might upon examination prove probative of drug activity, it cannot be said that there was probable cause to believe that Gov. Exhs. H and I had an "immediately apparent" evidentiary value, even to a trained DEA officer. Of course, as indicated above, the officers clearly had probable cause to obtain a search warrant to look for the "diary" or notebook which the defendant was reported to have maintained. However, they may not do so without such a warrant under the facts and circumstances of the case.