**TEXAS DEPARTMENT OF MENTAL HEALTH & MENTAL RETARDATION, et al., Appellants,**

**v.**

**TEXAS STATE EMPLOYEES UNION, et al., Appellees.**

**No. 14460.**

Court of Appeals of Texas, Austin.

Feb. 19, 1986.

Rehearing Denied April 30, 1986.

Jim Mattox, Atty. Gen., Lou Bright, Asst. Atty. Gen., Austin, for appellants.

James C. Harrington, American Civil Liberties Foundation of Texas, Inc., Austin, for appellees.

Before POWERS, EARL W. SMITH and BRADY, JJ.

POWERS, Justice.

The Texas Department of Mental Health and Mental Retardation (the "agency") enacted regulations providing that its employees, under certain conditions, may be required to submit to a polygraph examination in the course of an agency investigation of alleged employee misconduct.[1] Tex. Civ.Prac. & Remedies Code, chpt. 37 (1986). An employee's refusal to do so may have adverse employment consequences as set out in the regulations. In a suit by the Texas State Employees Union and ten agency employees (the "appellees"), the trial court declared the regulations invalid and enjoined their enforcement. We will reverse the judgment below and remand the cause to the trial court.

## THE REGULATIONS

The agency's regulations provide that an employee may be dismissed if he refuses to submit to a polygraph examination in the course of certain administrative investigations by the agency or the agency facility where he is employed. He may also be dismissed if he initially submits to the examination but in the course of it refuses "to answer a question or questions directly related to the performance of his official duties...." Dismissal may not be ordered, however, unless the personnel director of the agency makes the following determinations *after* the employee's refusal to submit to the examination or answer a particular question or questions:

1. There is reasonable cause to believe that there has been an incident of (a) Class I or Class II client abuse or neglect as defined in Rules of the Commissioner of MHMR 302.04.19.-001–.009[;]
 (b) drinking alcoholic beverages or taking illegal drugs while on duty or on the grounds of [an agency facility]; or
 (c) theft, assault, or sale or distribution of illegal drugs occurring during duty hours, or on the campus of [an agency] facility or otherwise directly related to work performance.

2. there is reasonable cause to believe that the employee acted or failed to act in the incident in a manner that violates the Commissioner's Rules; and

3. other reasonable investigatory alternatives [to the polygraph examination] have been exhausted, including, at a minimum, an interview of the employee.

The regulations do not specify the circumstances under which an employee may

---

1. The "polygraph," as the word implies, combines the measurements of several physiological reactions to questions asked the individual being interrogated. The measures taken are of the individual's blood pressure, pulse, respiration, and "galvanic skin response." The theory is that the act of lying induces stress, fear or anxiety, and consequent changes in these physiological factors. The most important element in the theory is the examiner's ability to interpret properly the changes in measurement.

be ordered to submit to a polygraph examination. This omission is evidently intended to be supplied by the Commissioner's "Notice to Employees" issued December 12, 1983. The notice provides as follows:

\*　\*　\*　\*　\*　\*

Mandatory polygraph exams are intended only to assist the [agency] in its ability to investigate the following serious problems:

1. [Patient] abuse or neglect;

2. Activity which endangers or threatens the health and/or safety of other employees and/or [patients];

3. Theft or other criminal activity on the grounds of the facility or otherwise related to [S]tate employment; and

4. Drinking alcoholic beverages or taking illicit drugs or being under the influence of alcohol or such drugs during working hours.

Mandatory polygraph exams will not be used indiscriminately. Very few employees will ever be required to undergo such an exam *and then only after a determination that all other reasonable alternatives have been exhausted.*

Results of polygraph exams are admissable [sic] by either party in [an agency] grievance hearing; but such results, standing alone, cannot be the basis for a determination. There must be evidence other than the results of a polygraph examination for the presiding officer to determine that the facility has proven the allegations against an employee.

(emphasis added). The foregoing is apparently intended to limit use of the polygraph examination to investigations of the four categories of employee misconduct set out above; and to limit its use still further by the proviso that an employee will not be required to submit to a polygraph examination until a determination has been made (by an unnamed official) "that all other reasonable alternatives have been exhausted."

The regulations rather carefully prescribe the procedure to be followed in administering the polygraph examination:

\*　\*　\*　\*　\*　\*

(b) An employee required to participate in a polygraph exam shall be given written notice of the specific incident under investigation and the basis upon which he is suspected of having been involved in the incident at least twenty-four hours before being required to participate in a polygraph exam.

(c) All polygraph examinations must be performed by a polygraph examiner licensed under Texas law.

(d) An employee required to participate in a polygraph exam may be accompanied to the exam by a representative of the employee's choice. The representative shall be allowed to monitor the exam from outside the examination room through either a two-way mirror or an audio device.

(e) All polygraph exam questions must be specifically, narrowly and directly related to the employees [sic] performance of his official duties in connection with the specific incident that is the subject of the investigation *or necessary for the proper administration of the polygraph exam.* Unless otherwise agreed to by the employee, no polygraph exam question may inquire into the employee's

1—religious beliefs and affiliations;

2—beliefs and opinions regarding racial matters;

3—political beliefs and associations, including union membership or activity;

4—knowledge of, or participation in, a specific crime or crimes that are not related to the specific incident that is the subject of the investigation;

5—sexual preferences and practices that are not related to the specific incident that is the subject of the investigation.

(f) An employee required to submit to a polygraph examination will be given a written list of the questions to be asked on the exam before the exam begins.

(g) An employee required to participate in a polygraph exam shall have the opportunity to discuss the polygraph exam

questions with his representative before the exam begins.

(h) All employees who participate in a polygraph exam, the results of which indicate deception on the part of the employee, shall be given an opportunity to explain the result. Under no circumstances shall an employee be required to explain the result.

(i) Neither the fact that an employee participated in a polygraph exam nor the results of a polygraph exam are admissible in a departmental grievance hearing without the agreement of the employee and the facility. The fact that an employee refused to participate in a polygraph exam is admissible only in a departmental grievance hearing arising from an alleged violation of this section. . . .

(emphasis added).

The foregoing procedural instructions are contained in Section 10 of the regulations. That section concludes with the following "Note to Employees . . .":

By answering questions under [Section 10], you do not lose your constitutional rights against self-incrimination. The United States Supreme Court has held in the case of *Garrity v. New Jersey,* 385 U.S. 493 [87 S.Ct. 616, 17 L.Ed.2d 562] (1967), that answers to questions asked of a public employee who faces job termination for refusal to answer cannot be

used against the employee in a subsequent criminal proceeding. The U.S. Fifth Circuit Court of Appeals in *Gulden v. McCorkle,* 680 F.2d 1070 (1982), reiterated the holdings of the U.S. Supreme Court described above and applied them to a situation in which a public employee refused to submit to a polygraph examination.

## THE CONTROVERSY

Appellees sued the agency in an original action in district court, contending among other things that the agency's "mandatory polygraph policy" was invalid because it "violates Texas constitutional and common law rights of privacy" held by agency employees. Other allegations need not concern us here because the trial-court judgment, which enjoins the agency from requiring its employees to submit to polygraph examinations, rests solely on the ground that the regulations purport to authorize violations of the employees' common law rights of privacy.[2] Moreover, we need not discuss here a related cause of action, because it was severed in the trial court, or the matter of a class designation, because the trial court made no such designation under Tex.R.Civ.P.Ann. 42 and no complaint is made in that regard on appeal.

The trial court filed findings of fact and conclusions of law.[3] They revolve around two basic propositions:

---

**2.** For a general discussion of the questions involved in the present case, as well as unrelated legal issues raised by the use of polygraph examinations, *see* Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection,* 70 Yale L.J. 694 (1961); Toomey, *Compelled Lie-Detector Tests and Public Employees: What Happened to the Fifth Amendment?,* 21 S.Tex. L.J. 375 (1981); Comment, *Privacy: The Polygraph in Employment,* 30 Ark.L.Rev. 35 (1976); and the several writings listed in Scheafer, *Refusal to Submit to Polygraph Examination as Ground for Discharge or Suspension of Public Employees or Officers,* 15 A.L.R. 4th 1207 (1982 & Supp.1985); Schopler, *Supreme Court's Views as to the Federal Legal Aspects of the Right of Privacy,* 43 L.Ed.2d 871 (1976 & Supp.1985); and *Privacy, Polygraphs, and Employment, A Study Prepared by the Staff of the Subcommittee on Constitutional Rights of the Committee on the*

*Judiciary, United States Senate, 93rd Congress* (U.S. Govt. Printing Off., Wash.1974).

**3.** We may summarize the evidence as follows:

*Patient abuse and neglect.* Some evidence was adduced concerning incidents of patient abuse or neglect, ranging from the most serious to minor incidents, attributable to employee misconduct. The following tabulations summarize the number of such incidents in fiscal year 1983 and parts of fiscal year 1984:

| | FY 1983 | FY 1984 (1st qtr. only) | FY 1984 (2d qtr. only) |
|---|---|---|---|
| Incidents Alleged | 775 | 141 | 169 |
| Confirmed | 172 (22%) | 52 (37%) | 43 (25%) |
| Unconfirmed | 583 | 89 | 126 |

Before the regulations were enacted to authorize mandatory polygraph examinations, the agency's experience had been that some 23% or

1. It is the agency's policy to employ "control questions" in administering the polygraph examinations to its employees.[4] These control questions are designed to establish a reference mark showing the examinee's physiological response to sensitive matters *unrelated* to the particular incident under investigation. Examples of

24% of alleged instances of employee misconduct would be confirmed. The rate of 22%, for FY 1983, approximates this general experience. The regulations were in effect in the first quarter of FY 1984, when the rate increased to 37%; and were not in effect in the second quarter when the rate fell to 25%. A reasonable inference would be that in some manner the mandatory polygraph policy assisted in confirming more instances of employee misconduct than occurred without the policy. The difference is significant. However, other evidence in the record suggests that the inference ought not to be drawn without further statistical analysis that has not been done. In light of the relatively small number of incidents alleged, we believe it plain that we impose no great burden on the agency in our requirement hereafter that the agency afford its employees notice and hearing before they may be required to submit to a polygraph examination.

The evidence also summarizes, for fiscal year 1984, the causes of patient injuries:

| | |
|---|---|
| Injuries Caused by Other Patients | 23.9% |
| Self-Inflicted Injuries | 16.8% |
| Injuries Caused by Agency Employees | 1.1% |
| Accidental Injuries | 30.7% |
| Other Causes, or Cause Unknown | 27.5% |

*Reliability and Efficacy of Polygraph Examinations.* The evidentiary record contains the opinion testimony of two expert witnesses, one holding that polygraph examinations are sufficiently reliable for assistance in administrative investigations so as to constitute a reasonable basis for agency decisions in such investigations; and, the other holding the opposite opinion. Agency officials testified that they adhered to the former opinion and found the examinations useful in practice.

*Abuse of the Polygraph Examination.* A few agency employees testified that they were deceived, insulted, or otherwise mistreated in the course of a polygraph examination. There is no evidence that this mistreatment reflects agency policy in any respect or that it is systematic or characteristic of a majority of cases. We may not, of course, declare the regulations invalid in consequence of such episodes alone.

*Other Matters.* We are unable to find any direct evidence of the number of individuals in the agency's care at any particular time. One table in evidence allows the inference that the 13 State schools had a patient population of something over 9,000 in the first quarter of 1984. Presumably, this number would not change significantly from month to month. It has been estimated that State hospitals, on the other hand, had in 1980 an average daily patient population of 5,608. Barna, *State Mental Health Services: Change Under Pressure* (Texas House of Representatives, House Study Group, Special Legislative Report No. 106, 1984), p. 5. It is difficult to overstate the conflicting demands made of the agency, the difficulties under which it labors, and the complexity of its administrative tasks. These are summarized in Barna, *supra.* While we do not attribute too much firmness to the figures, we note for example the author's assertion that a 1981 study revealed that six out of ten agency employees, engaged in the direct care of patients, had been physically assaulted by them; that half of the agency employees earned an annual salary that was $5,000 *under the average* salary paid State employees; and that these factors attributed to a turnover rate that was 52.2% in 1979, now down to 22%. Barna, *supra,* at 65.

The parties have used the word "clients" in referring to those individuals who receive the services provided by the Department of Mental Health and Mental Retardation. They have used also the word "residents" in referring to the individuals who live in facilities operated and supervised by the Department. We prefer to use the word "patients" to refer to either group. We recognize that not all the individuals in either group receive medical treatment; but we are not persuaded that the word "patients" is less descriptive or appropriate. For example, we note that various statutes use interchangeably the three words. *See* Tex.Rev.Civ. Stat.Ann. arts. 5561f, § 1(d) (Supp.1986) ("patient"); 5547–300, § 3(12) (Supp.1986) ("client"); 5561cc, § 13(a) (Supp.1986) ("resident's, patient's, or client's"). Indeed, Tex.Rev.Civ.Stat. Ann. art. 5561h, § 1(b) (Supp.1986) contains the inane expression "patient/client."

4. The utilization of "control questions" as a component part of the polygraph examination is the chief point of controversy in the present case, presenting a *narrower* privacy issue than would be posed by a use of such examinations without such questions. A "control question" is a question about an act of wrongdoing in the past, of the same general nature as the incident under investigation, and about which the individual being interrogated would be expected to lie or give a dubious answer. The theory is that the individual's physiological responses to such questions will give a reference mark to compare to the measurements associated with his answers to (1) innocuous questions and (2) questions directed at the incident under investigation. *See* Herman, *Privacy, the Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing,* 47 Wash.L.Rev. 73, 80–81 (1971).

such questions are: "Do members of your family smoke dope?"; "Have you stolen anything in your life or in the past 10 years?" "Have you used alcohol, prescription drugs, or marijuana?"; "Have you beaten your kids?" It is the agency's position that such questions are necessary for a proper administration of the polygraph examination. These sensitive matters must be revealed by the employee owing to the coercive prospect of dismissal that is possible under the regulations. Such questions, if answered, constitute intentional intrusions into the employee's solitude, seclusion, private affairs, and concerns so as to be highly offensive to a reasonable person, and thus an invasion of privacy that cannot be justified by any countervailing public interest.

2. While polygraph examinations are, under optimum conditions, capable of detecting deception at a rate greater than chance, they are unreliable to a degree. This element of unreliability precludes dismissal as a consequence of refusing to take the examination or to answer certain questions as part of the examination. While such examinations have limited utility as an investigatory tool, the dismissal would be unjust and unlawful in light of this element of unreliability.

The agency appeals now by challenging the aforesaid findings of fact and conclusions of law. Appellees, by cross appeal, contend the trial court erred in not awarding attorney's fees and damages, owing to sovereign immunity, and in not holding the mandatory polygraph examinations violative of the employee's constitutional right against self-incrimination.

### THE COMPETING PUBLIC AND PRIVATE INTERESTS

#### The Public Interest

The regulations are patently designed to further an important and substantial public interest—the State's interest in a safe, orderly, efficient, and effective mental-health system. This system has been established by the Legislature for several purposes falling within the general aim of providing "for the conservation and restoration of mental health among the people of this state...." Tex.Rev.Civ.Stat.Ann. art. 5547–201(a) (Supp.1986). Among such purposes is the care of mentally ill and mentally retarded patients in eight State hospitals and 13 State schools, the care of inmates of various other institutions, and the administration of the central offices of the agency. *Id.*, art. 5547–202, § 2.01. For such purposes, the agency employs over 25,000 persons. Tex.Adv.Comm. on Intergovt. Relations, *Handbook of Governments in Texas*, p. I–191 (1973 & Ann.Supp.).

The large scale of agency operations imposes various practical limitations on those operations. Some are inherent in any large-scale undertaking that requires supervision, direction, and coordination of large numbers of people, whether employees or patients. Other limitations result from funding restrictions, the imperfection of human beings, and the nature of the tasks given the agency by the Legislature. The system is, moreover, not free of the ills that plague society as a whole: assaults, thefts, reckless conduct, and drug and alcohol abuse. These do occur within agency institutions where ill-paid and insufficient numbers of employees care for the most violent individuals as well as the most placid.

Finally, we should observe that the agency operates under a complex statutory framework that imposes upon the agency a duty to make adjustments and accommodations for competing interests. *See generally* Texas Mental Health Code, Tex.Rev.Civ. Stat.Ann. art. 5547–1 *et seq.* (Supp.1986); Texas Mental Health and Retardation Act, Tex.Rev.Civ.Stat.Ann. art. 5547–201 *et seq.* (Supp.1986); Texas Mentally Retarded Persons Act, Tex.Rev.Civ.Stat.Ann. art. 5547–300 *et seq.* (Supp.1986); and Tex.Rev.Civ. Stat.Ann. arts. 5561a–5561g (Supp.1986). For example, mental-health patients are statutorily entitled to receive from the agency "a humane treatment environment that affords reasonable protection from harm." Tex.Rev.Civ.Stat.Ann. art. 5447–80(b)(5). Even without that statute, how-

ever, one would assume that the State's custody of a patient and his property imply the same duty of protection. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). On the other hand, the State's paternalistic care may not go further than necessary—it may not impinge *unduly* upon a patient's "rights, benefits, responsibilities, and privileges guaranteed by the constitution and laws...." Tex. Rev.Civ.Stat.Ann. art. 5547–80(a). For another example, the agency is charged to protect its patients, but it must also protect the community from its patients. *See, e.g.,* Tex.Rev.Civ.Stat.Ann. arts. 5547–26, 5547–27, 5547–80(b)(1).

The scale and complexity of the State's interest constitute essential considerations in any comparison with the private interests of its employees, which is itself an important and substantial interest under the common law of the State.

### The Privacy Interest

It may not be doubted that the regulations and the control questions authorized therein expose to harm the privacy interest held by agency employees under the protection of the common law of this State.

As a legal concept, "privacy" most often finds expression in three areas: (1) in the common law, where the applicable rules of that body of law protect the privacy interest by familiar legal and equitable remedies; (2) in constitutional law, where the privacy interest is also protected in the course of enforcing one or more specific provisions of the Federal or State constitutions; and (3) in statutory law, where a legislative body has provided for protection of the privacy interest or qualified that interest in some particular.[5] In the present case, we deal with the concept in a context

---

**5.** We believe it necessary here to set out the interplay between the Constitution of the United States and the common law of Texas as they bear upon the privacy interest.

a. *Protection of privacy as a substantive legal interest under State common law.* As discussed in the opinion, the general right of privacy has been left to development in the common law of the States. In our opinion, we discuss the Texas common law in that regard. We do so to sketch the outline of this interest, to show its application in the context of State employment, and to set forth the basis of the trial-court judgment. The parties, however, do not dispute that the common law of this State does recognize and protect individual privacy. The *Atkinson* and *Industrial Foundation of the South* cases preclude any doubt in that regard.

b. *Protection of privacy as a substantive legal interest under the Constitution of the United States.* There is no general right of privacy found in the Federal Constitution. Instead, it is said that the specific guaranties in the Bill of Rights and other Constitutional provisions have "penumbras" emanating from the specific guaranties themselves. These "penumbras" encompass additional interests like those specifically protected. For example:

(1) The *First Amendment,* in its protection of speech, press, assembly, and petition, protects by extension an individual's involvement in partisan politics. Compelled disclosure in that regard may seriously infringe on the individual's *privacy* interest which is one *aspect* of his involvement in partisan politics; however, a compelling public need that cannot be met in a less restrictive way will override the individual's privacy interest, particularly when the free functioning of national institutions is involved. *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

(2) The *Third Amendment,* regulating the quartering of soldiers in private homes, creates a zone of privacy and protects that interest from governmental intrusion. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

(3) The *Fourth Amendment* protects against *unreasonable* searches and seizures in order that individuals may be secure in their persons, houses, papers, and effects. It is in this amendment that the framers directly addressed the subject of personal privacy. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue. They did not seek in still another amendment—the Fifth—to achieve a general protection of privacy but to deal with the more specific issue of compelled self-incrimination. *Fisher v. United States,* 425 U.S. 391, 400, 96 S.Ct. 1569, 1576, 48 L.Ed.2d 39 (1976).

(4) The *Fifth Amendment* protects privacy, in one sense, in consequence of the privilege against compelled self-incriminating testimony. But its protection of the privacy interest is limited to those cases where self-incriminating testimony *is* compelled. For example, private incriminating statements may be overheard and used in evidence in a criminal proceeding if they are not compelled at the time they were uttered and disclosure of private information may be compelled if immu-

where the agency, *by administrative regulation,* has attempted both to qualify and protect the privacy interest of its employees.

> nity removes the risk of incrimination. *Fisher v. United States, supra; Katz v. United States, supra; Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The Fifth Amendment does not operate under a reasonableness standard; its strictures are not removed on a showing of probable cause. Consequently, to the extent *that* amendment protects the privacy interest, the public interest is irrelevant if the Fifth Amendment indeed applies to the case. *Fisher v. United States, supra.*
>
> (5) The *Ninth Amendment* protects privacy by implication from its express provision that the enumeration of certain rights in the Constitution shall not be construed to deny or disparage others retained by the people. *Griswold v. Connecticut, supra.*

In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), it was said that the Court's decisions concerning "zones of privacy" emanating from the specific Constitutional provisions "have in fact involved two kinds of interests": (1) an individual's interest in avoiding disclosure of personal matters and (2) his interest in certain kinds of important personal decisions, such as those relating to marriage, procreation, contraception, family relationships, and child rearing and education, citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In the present case, we deal of course with the former privacy interest.

The trial court in the present case did not base its judgment on any *constitutional* protection given the privacy interest, but solely upon the protection given that interest by the *common law of Texas.* On appeal, the parties dispute the effect of this distinction. It appears to us to be a distinction without a difference.

As stated in *Fisher v. United States, supra,* the Federal Constitution directly addresses the privacy interest in the Fourth Amendment guarantee against unreasonable searches and seizures. The scope of protection given by that amendment to the privacy interest is measured by the "reasonableness" standard. *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). This is the identical standard established by the common law of Texas for determining the scope of protection given that same interest by that portion of its common law dealing with tortious invasions of the interest or the imposition of unreasonable conditions of employment. *With one exception,* no other provision of the State or Federal constitutions gives to the privacy interest a scope of protection greater than that implied by the "reasonableness" standard; and, with that same exception, none suggests that the privacy interest is absolute in the sense that it must prevail to the fullest extent in

The common law concept of privacy existed *before* adoption of the Federal Constitution. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).[6]

any and all circumstances. The one exception is, of course, the protection given the privacy interest by the Fifth Amendment. It is plainly not subject to the "reasonableness" standard— one may not be compelled to give self-incriminating testimony no matter how reasonable that may appear to be in the circumstances.

c. *Constitutional protection of a State-recognized privacy interest under the procedural due process guaranty of the Fourteenth Amendment.* As distinguished from those cases involving privacy as an aspect or element of a *substantive* right, established by extension from some specific guaranty in the Federal Constitution, the privacy interest may *also* come within the *procedural* due process guaranty of the Fourteenth Amendment. Even though the privacy interest is *not* within the "penumbra" of any specific guaranty in the Constitution, a State is free under its common or statutory law to recognize and protect the interest if it sees fit to do so. If such protection *is* given, however, the guaranty of procedural due process in the Fourteenth Amendment precludes arbitrary State action in reference to that right. For example, having recognized by its driver's license laws a right in individuals to drive on State highways, a State may not withdraw that statutory right without affording licensees procedural due process of law in a proceeding directed at revocation of their licenses. *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Or having established that parolees may remain at liberty, on conditions specified in their paroles, a State may not alter their status on allegations they violated such conditions unless they be afforded the minimum procedural safeguards required by due process of law. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). *See generally Paul v. Davis, supra.* This matter of procedural due process bears upon the present case in the form of the minimum procedural safeguards we have imputed to the regulations, along with a standard for the exercise of agency discretion, to preserve their validity.

6. Privacy has been described as "the right of the individual to decide for himself, with only extraordinary exceptions in the interest of the whole society, when and under what conditions his thoughts, speech, and acts should be revealed to others." Quoted in Herman, *supra,* at 127–28 (1971). The common law concept of privacy is not found in Blackstone and it is customary to say that it crystalized in Warren and Brandeis, *The Right of Privacy,* 4 Harv.L. Rev. 193 (1890). But the dominant theme of the article is this: the common element in many old

Judicial development of the common law, with reference to protection of the privacy interest, has always been left to the States just as the States also developed their common law to protect individuals' interest in property. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). All but a very few States presently recognize and protect the privacy interest. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). While some specific constitutional guarantees do encompass a privacy *element* or have a privacy *aspect*, there is no "constitutional right of privacy" in the sense of a *general* "right of privacy" that the Constitution protects.

> [T]he Fourth Amendment cannot be translated into a general constitutional "right to privacy." That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all. Other provisions of the Constitution protect personal privacy from other forms of governmental invasion. But the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual states.

*Katz v. United States, supra*, 389 U.S. at 350, 88 S.Ct. at 510 (emphasis added).

In the present case, there exists no asserted conflict between one party's privacy interest and a constitutional right of another. Rather, the conflict here is that which exists between the employees' privacy interest and the State's interest in a safe, orderly, efficient, and effective mental-health system, operating under State statutes and administrative regulations toward a goal of improving or ameliorating the condition of patients in the State's custody. And, of course, included in this goal is the specific aim of protecting patients from maltreatment, neglect, theft, or other injurious acts by agency employees. It is readily apparent that such patients have

---

judicial decisions, which nominally vindicate a person's interest in his "life," "liberty," or "property," is actually a judicial protection of a "personality" interest. The authors termed the interest a "right of privacy," or the "right to be let alone." The latter expression they borrowed from an earlier writing—Cooley, *The Elements of Torts* (1878).

It would appear that the same privacy interest is invaded whether the examination includes control questions or not. However, when the privacy interest is invaded by job-related questions, it is easy to see that such an intrusion is reasonable and warranted under the rule that a State employee is under a duty to respond to job-related questions put to him by his employer. It is upon this basis that appellees concede, and we believe correctly, that a mandatory polygraph examination *without* control questions does not amount to an unreasonable condition of employment. On the other hand, when control questions are utilized in the examination, they raise a distinctly different problem for on their face they are *not* job related. Because they are not job related, one may not conclude they are reasonable under the rule that a State employee must answer job-related questions put to him by his employer. May they be viewed as reasonable on some other ground so that the resulting invasion of privacy is nevertheless warranted? The appellees contend there is no other such ground.

The agency counters with the proposition that the control questions *are* job-related in the sense that they are, in the agency's view, reasonably necessary for a proper administration of the polygraph examination. There is in the record reasonable scientific opinion that supports the agency's view. There is also in the record some indication that control questions are not essential to the proper administration of such examinations. It is within the agency's power to adopt one theory or the other and we may not quarrel with the wisdom of its choice. But the agency must live with the consequence of its choice: If control questions *are* to be employed in the course of administering a polygraph examination, then individual privacy will be invaded in such examination; therefore the invasion must be justified *in each case*, and under the circumstances of that case, as being necessary or essential to preserve or further the public interest in the safe and orderly operation of its mental-health system. On the other hand, were the agency to adopt the other theory, so that control questions are *not* employed, it would appear that the case-by-case determination would not have to be made at all. Then the questions would all be related to innocuous matters or matters pertaining to the incident under investigation, and thus job-related. Consequently, there would be no invasion of privacy that must be justified as warranted because it is necessary or essential to a paramount public interest.

constitutional and other legal rights in their life, liberty, and property, but in our view a consideration of the present case does not require analysis along that line because their interests are encompassed in what we have denominated the State or public interest. We turn then to a correct identification, under Texas common law, of the privacy interest claimed by the employees in the present case.

■ An individual's privacy interest formerly was *not* an interest that the Texas common law would protect by injunctive relief or redress by compensatory damages in an action at law. *Milner v. Red River Valley Pub. Co.*, 249 S.W.2d 227 (Tex.Civ. App.1952, no writ). Presently, however, the contrary is true and the courts of this State "follow the rule that an *unwarranted invasion* of the right of privacy constitutes a legal injury for which a *remedy* will be granted." *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex.1973) (emphasis added). The remedy may be either injunctive relief or compensatory damages, or both. *Kramer v. Downey*, 680 S.W.2d 524 (Tex. App.1984, writ ref'd n.r.e.).

While *Atkinson* established the privacy interest as one thenceforth to be protected by the common law of Texas, it was necessary for the Supreme Court of Texas to delineate further that legally protected interest. This was done in *Industrial Foundation of the South v. Texas Industrial Accident Board*, 540 S.W.2d 668 (Tex. 1976). There, the Court determined that the privacy interest was not *constitutionally* protected in the circumstances of the case but that the *tort law* of the State might well protect the very same interest in those circumstances, as that law might apply directly or by analogy in the administration of the State's Open Records Act, Tex.Rev.Civ.Stat.Ann. art. 6252–17a (Supp. 1986). In its analysis, the Court borrowed from a law-review article, Prosser, *Privacy*, 48 Cal.L.Rev. 383 (1960), to establish that the privacy interest actually consists of four separate interests, and allows for "four distinct torts, each subject to differ-

ent rules...." The four interests were described as follows:

1. *Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.*

2. *Public disclosure of embarrassing private facts about the plaintiff.*

3. Publicity which places the plaintiff in a false light in the public eye.

4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

540 S.W.2d at 682 (emphasis added). We need concern ourselves here only with the first category. While the second category —"[p]ublic disclosure of embarrassing private facts about the plaintiff"—may appear to be applicable, it is not really because the publicity element of that category refers to disclosure to the public at large, as distinguished from the law of defamation where "publication" may be actionable if communicated to a single person. *See id.* at 683. We assume here that an employee's answers to a polygraph operator's questions are not communicated to the public at large.

■ The first category, the one with which we *are* concerned, contemplates the following: (1) an intentional intrusion; (2) upon the seclusion, solitude, or private affairs of another; (3) which intrusion is highly offensive to a reasonable person. *Gill v. Snow*, 644 S.W.2d 222 (Tex.App. 1982, no writ); Restatement (Second) of Torts § 652B (1977). While this kind of intrusion is ordinarily associated with spying, wiretaps, or microphones, *Gonzales v. Southwestern Bell Tel. Co.*, 555 S.W.2d 219 (Tex.Civ.App.1977, no writ), we see no distinction in that regard when the intrusion takes the more direct form of obtaining information (including physiological reactions) through questions directed to the individual himself when he is under a compulsion to answer them.

Explicit in these statements describing the common law tort against the privacy interest is the essential element of reasonableness. It is the "unwarranted" intrusion that is actionable when it is highly

offensive to a "reasonable" person. *Billings v. Atkinson, supra; Gill v. Snow, supra.* Or, stated another way, the common law protects only an individual's reasonable expectations of privacy. The same element of reasonableness is found in the common-law regulation of the *general* relationship between government and its employees, a matter we shall now discuss because the privacy claim here occurs within and is qualified by that segment of the common law.

## THE COMPETING INTERESTS WITHIN THE CONTEXT OF STATE EMPLOYMENT

 State government has wide discretion and control over its employees in order that it may efficiently and effectively achieve the important ends of government. State employees are, consequently, subject to *reasonable* orders and regulations pertaining to their work and conduct. While State employees do not, of course, surrender their common law, statutory, constitutional, or other legal rights upon accepting State employment, a qualification of those rights may fall within the zone of reasonableness because of the circumstances of public employment and the particular case. *See generally* 67 C.J.S. Officers and Public Employees § 89, pp. 412–13 (1978). *This only* is the meaning of the frequent observation that State government may impose upon its employees restrictions that could not be imposed upon private persons. *Id.* § 218. State employment may simply invoke different or additional considerations in making a judgment about what is "reasonable."

 Included among the prerogatives of State government as an employer is its authority to question a State employee concerning matters relevant to his employment. The State may dismiss or discipline an employee, after proper proceedings, if he refuses to account for the performance of his employment duties. If he is not coerced into waiving a constitutional right, there is no constitutional impediment to such dismissal or discipline. *Gardner v.*

*Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men Asso. v. Commissioner of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Lerner v. Casey,* 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423 (1958); *Slochower v. Board of Higher Education of the City of New York,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Garner v. Board of Pub. W. of Los Angeles,* 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951).

The Supreme Court of Texas has implied that a public employer may include in its questioning of a public employee "the use of polygraph tests ... when there is cause to believe a public employee has performed his official duties illegally." *Talent v. City of Abilene,* 508 S.W.2d 592, 596 (Tex.1974). In the same paragraph, the Court implied that polygraph tests are *not* sanctioned if they are *unrelated* to the employee's duties or if they are otherwise "clearly unreasonable." *Id.* (emphasis added).

In *Richardson v. City of Pasadena,* 500 S.W.2d 175 (Tex.Civ.App.1973), rev'd on other grounds, 513 S.W.2d 1 (Tex.1974), the court recognized that a police officer may be disciplined by his employer for refusing a direct order to submit to a polygraph examination as part of "a departmental investigation of a matter relating to efficiency and credibility when *reasonable cause* exists to believe that the police officer can supply relevant knowledge or information." 500 S.W.2d at 177 (emphasis added).

These two Texas decisions plainly suggest that the *reasonableness of an order to submit to a polygraph examination,* given to a government employee by his supervisor and enforceable by dismissal or discipline, is the criterion for determining whether the employee must obey the order or suffer the consequences. This appears to be the rationale common to those judicial decisions which uphold such orders. *See* Scheafer, *Refusal to Submit to Polygraph Examination as Ground for Discharge or Suspension of Public Employees or Officers,* 15 A.L.R. 4th 1207 (1982); Toomey,

*Compelled Lie Detector Tests and Public Employees: What Happened to the Fifth Amendment?*, 21 S.Tex.L.J. 375, 383–85 (1981).

While the case dealt specifically with a claim of self-incrimination, the Supreme Court of Washington, in *Seattle Police Officers' Guild v. City of Seattle*, 80 Wash.2d 307, 494 P.2d 485 (1972), mentioned some of the factors that may bear upon the issue of "reasonableness."

> In the instant case, serious and notorious charges of crime and corruption had, with appreciable cause, been leveled against members of the police department. ... [I]f, in the exercise of prudent judgment, the investigating authority determines it *reasonably necessary* to utilize the polygraph examination as an investigatory tool to test the dependability of prior answers to questions *specifically, narrowly and directly related* to the performance of their *official* duties, then, such investigating authority may properly request such officers to submit to a polygraph test under pain of dismissal or refusal.

*Id.* 494 P.2d at 493 (emphasis added). The notice in *City of Seattle* specifically directed the officers to take the polygraph examination; assured them that the questions asked would be specifically, directly, and narrowly related to their official duties; guaranteed they would not be required to waive any immunity from criminal prosecution; and, advised them that information gained through the polygraph examination would not be used against them in any criminal proceeding. The Court noted that the nature of the charges of official corruption created serious public doubt about the integrity, morality, and fidelity of the police department and its employees, fully justifying the internal investigation wherein the polygraph was proposed to be used. The investigation itself being fully justified, what then of the department's decision to employ the polygraph? The Court held the reasonableness of this decision was subject to *judicial* scrutiny to guard against abuses. Therefore, when such judicial oversight is available and where the results of the examination and the employee's decision whether to submit to it are not admissible in any subsequent proceedings, the Court held the employees not entitled to a writ of prohibition forbidding entirely the use of the polygraph.

In the present case, the regulations suggest on their face an intent to avoid abuse while permitting and controlling the use of polygraph examinations within a narrow aspect of agency employment—administrative investigations in four categories of possible employee misconduct. Stated another way, the regulations evidence an attempt to accommodate the public and private interests put in conflict by the agency's decision to utilize polygraph examinations and its decision to employ control questions in such examinations.

## ACCOMMODATION OF THE COMPETING INTERESTS

■ The trial-court judgment condemns as invalid the regulations promulgated by the Commissioner and enjoins their enforcement. While we agree with the trial court's determination that a polygraph examination based on control questions constitutes an intrusion upon the employee's privacy, we do not believe that to be the sole determinant of whether the regulations are valid administrative enactments nor does that one determinant render the regulations invalid in any and all circumstances. There may be circumstances where the intrusion upon employee privacy *is* warranted and a reasonable employment condition. This possibility precludes a determination that the regulations are invalid and unenforceable in all cases that may arise thereunder. The privacy interest is not absolute in all cases. Consequently, the trial court judgment must be reversed.

### Applicable Rules of Construction

■ The regulations come before any court attended by a *presumption* that they are *valid* sublegislation by the agency. A reviewing court may not concern itself with whether the regulations—that is, the policy

decisions they embody—are wise, desirable, or necessary. It is sufficient that the agency could legitimately view them as being so. *Bullock v. Hewlett-Packard Co.,* 628 S.W.2d 754, 756 (Tex.1982). The presumption of validity includes a presumption that facts existed which justified the regulations. *Id.*

The presumption of validity also bears upon the correct meaning to be assigned the regulations in any judicial review of their validity.[7] We must, for example, interpret them as being intended by the agency to protect the legal rights of *both* the agency and its employees. *Trapp v. Shell Oil Co.,* 145 Tex. 323, 198 S.W.2d 424, 438 (1946) (vital issue in review of agency rule is whether legal rights of parties in issue are protected, "legal rights" embracing both public and private rights.) Stated another way, we must view the Commissioner's regulations as being valid and therefore *not* intended to authorize *un*reasonable employment conditions or *un*warranted intrusions upon employee privacy.

It may be that the regulations omit to provide express standards for the exercise of agency discretion thereunder. They are not to be viewed, in consequence of the omission, as a license for arbitrary agency action. That is, the regulations in the present case are not to be viewed as purporting to license unreasonable or unwarranted intrusions upon employee privacy so that they *must* be struck down as violative of the privacy interest protected by the tort law of the State and by that branch of the State's common law pertaining to State employment.

The regulations are, instead, to be construed in an entirely different manner: if their validity depends upon the missing standards, a reviewing court must construe the regulations as if they in fact *embraced* the missing standards; and, the court may itself "lay down" or prescribe what those standards are. *Railroad Commission v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1026 (1942) (Agency rule must be given construction that will, if possible, sustain its validity; and if that can only be done by court laying down a standard to guide the agency in exercise of its discretion, then court must supply the standard and construe the rule as if it contained that standard.)

Where, as here, the agency regulations include provisions intended to accommodate conflicting public and private interests, a reviewing court must assign considerable weight to the accommodation reached by the agency. If that accommodation is a reasonable one—that is to say, one the Legislature would have sanctioned—it may not be disturbed by a reviewing court. *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Texas State Board of Barber Examiners v. Beaumont Barber College, Inc.,* 454 S.W.2d 729 (Tex. 1970).

### Statutory Basis for the Regulations

The regulations of an administrative agency must have a reasonable basis in some authorizing statute or statutes. *Southwestern Sav. & L. Ass'n of Houston v. Falkner,* 160 Tex. 417, 331 S.W.2d 917, 921 (Tex.1960). It is not contended here

---

**7.** It is axiomatic that agency regulations are to be interpreted in many respects in the manner employed in statutory construction. *Lewis v. Jacksonville Build. and Loan Ass'n,* 540 S.W.2d 307 (Tex.1976). We believe, by analogy, the following rules of interpretation would apply to the regulations we now review. We assume, of course, that the agency intended its regulations to be in conformance with constitutional requirements and construed accordingly. We should therefore make every reasonable intendment and presumption in favor of their constitutionality; and, if there could exist a state of

facts justifying the restrictions they contain, we should assume their existence. *County of Cameron v. Wilson,* 160 Tex. 25, 326 S.W.2d 162 (1959); *Smith v. Decker,* 158 Tex. 416, 312 S.W.2d 632 (1958); *Reed v. City of Waco,* 223 S.W.2d 247 (Tex.Civ.App.1949, writ ref'd). The burden of persuasion rests upon the one asserting unconstitutionality to point out precisely how a constitutional principle has been violated. *Duncan v. Gabler,* 147 Tex. 229, 215 S.W.2d 155 (1948); *Jefco, Inc. v. Lewis,* 520 S.W.2d 915 (Tex.Civ.App.1975, writ ref'd n.r.e.).

that the Commissioner lacked general authority to promulgate the regulations or that he failed to follow proper procedure in doing so. We should, however, refer to the statutory basis for the regulations as a useful guide in any construction to be given them.

■ There are no applicable statutes that deal expressly with the agency's use of polygraph examinations. In consequence, we may not impute to the Legislature any *particular* intent concerning their use. The question then arises whether their use may be within the *general* terms and purposes of any statute or statutes. *Chevron U.S.A. v. Natural Res. Def. Council, supra.* We hold their use to be within the implied statutory warrant given the agency to employ reasonable means to preserve order and safety in the mental-health system so that the purposes intended for that system by the Legislature may be efficiently and effectively achieved. These statutes have been mentioned previously. Although none specifically authorizes polygraph examinations by the agency, none *forbids* them. The presumption of validity includes a presumption that facts existed which justified the agency in its decision to employ polygraph examinations, as pointed out above. This presumption has not been defeated in the present case by contrary evidence. Indeed, one may infer from some portions of the evidence that such examinations may, in some circumstances, legitimately be viewed by the agency as a reasonable tool to use in maintaining order and safety in the mental-health system, the ultimate problem being to preserve the controlling element of reasonableness in any decision to employ the examinations as an investigatory aid.

And if the agency possesses the general power to prescribe the use of polygraph examinations in an administrative investigation, it follows necessarily that the agency possesses the power to determine such included matters as: (1) the circumstances under which a polygraph examination will be a reasonable condition of employment or a warranted intrusion upon an employee's

privacy; (2) the procedures to be followed in administering the examination and its content; (3) the use proper to be made of the examination results in light of the element of unreliability that indisputably exists in some degree in such examinations; and (4) the consequences proper to be imposed against an employee who refuses to submit to the examination or who refuses in the course of an examination to answer a particular question or questions.

■ But the very statutes from which the agency is permitted to infer a power to employ polygraph examinations also impose an inherent limitation upon their use. The Legislature never intended that any such statute should serve as implied authority to perpetrate an injustice against an employee. *State v. Mauritz-Wells Co.,* 141 Tex. 634, 175 S.W.2d 238 (1943). Consequently, the agency's inferred power to utilize polygraph examinations in an administrative investigation is *no greater than* what is reasonably necessary or essential to protect the State's interest in an orderly, safe, efficient, and effective mental-health system. Thus, like the presumption of validity mentioned above, the statutory authority for these regulations compels the inference that they were never intended by the agency to authorize an intrusion upon employee privacy that is *un*reasonable and *un*warranted in the circumstances of the particular case.

### The Regulations, as Written, Omit to Provide a Sufficient Standard to Govern The Exercise of Agency Discretion

■ The regulations evidence a conscious effort to accommodate the privacy interests of agency employees with any interest of the State intended to be furthered by use of the polygraph examination in an administrative investigation: they prohibit questioning an employee about certain specified matters; they carefully regulate the effect to be given any refusal to submit to the examination or answer particular questions; and, the Commissioner's notice to agency employees, clarifying the regulations, specifically limits the use of

such examinations to investigations where "all other reasonable alternatives have been exhausted" and impliedly limits them further to four categories of "serious problems" occurring within agency institutions. Nevertheless, the regulations suffer from several omissions, the cumulative effect of which is that unjust or arbitrary decisions are not necessarily foreclosed by the terms of the regulations.

We should first observe that the regulations embody the agency's decision that control questions may be a component part of any polygraph examination and the examinee *must* answer them on a theory they are "necessary for the proper administration of the polygraph exam [sic]." This is tantamount to a decision that in every instance employee privacy may be intruded upon in the polygraph examination. Moreover, it neutralizes entirely the protective provision that certain matters may not be inquired about in an examination. If employee privacy may thus be invaded in each examination, it follows that each use of the examination requires a finding, under the facts of the case, that an invasion of employee privacy *is* justified as reasonable and warranted by the State's supervening interest in safety and order in its mental-health system. This reference to the surrounding circumstances and a judgment based thereon contemplates an *antecedent* determination by the agency not the *subsequent* determination incongruously dictated by the regulations. The regulations *omit* to provide for any such determination *before* an employee is required to submit to a polygraph examination.

A decision to require an employee to submit to the examination is apparently made without reference to *any* express standard apart from the apparent requirement that "all other reasonable alternatives have been exhausted." It may, however, be entirely unreasonable to require an employee to yield his privacy in deference to some interest of the State *even if* "all other reasonable alternatives have been exhausted." For example, one would not think it reasonable to order an employee at an agency institution to surrender his privacy in favor of the public interest when a single empty beer can is inexplicably found at a place frequented by employees during working hours. On the other hand, it may be reasonable to require all such employees to yield their privacy interests in favor of a greater State interest when a series of unsolved murders in an institution has created panic that must be allayed quickly if order is to be maintained, safety is to be secured, patient care is to be continued, and public confidence is not to be undermined. Even if the examination results contained the 30% chance of error imputed to them by appellees' expert witness, one must assess the importance of that fact not in a vacuum but in comparison to the total circumstances, so that the agency's requirement for a quick, if rough, screening device might well outweigh the 30% chance of error. The reasonableness of the agency's decision increases, of course, if the chance of error is only 10%, which is the opinion held by the other expert witness in the case. (We do not here assess the issue of self-incrimination, of course).

But the regulations, as written, provide neither a standard nor a framework for an agency determination of reasonableness before an employee may be required to submit to an examination wherein his privacy may be invaded. It may be that the agency *would* make such a determination; but the regulations do not *require* it to be made and give no standard in that regard, so that arbitrary and unjust action *is* possible under the regulations as they are written. Consequently, we hold the Legislature would not have sanctioned the balance between public and private rights and interests that these regulations reflect.

### Guidelines for Exercise of Agency Discretion

Our holding relative to the possibility of arbitrary and unjust action under the regulations does not mean that we must declare them void in their entirety as the trial court did. Given that the regulations, as written, would not preclude an unreasonable governmental intrusion upon an employee's

privacy interest in contravention of the State's common law, the regulations do not compel that result; and, moreover, we may easily supply a standard that permits the agency to avoid such result in the exercise of its discretion under the regulations. Therefore, we must supply the standard under the requirement that the regulations are to be construed under the presumption of validity. *Railroad Commission v. Shell Oil Co., supra.*

Accordingly, we hold as follows:

**1.**

The State has an important and substantial interest in the maintenance of order and safety in its component institutions and departments.

**2.**

Agency employees possess a common law right of privacy protected by the tort law of this State from unwarranted intrusions by others, including the State, as well as a common law right to be free of unreasonable conditions in their employment by the State.

**3.**

In some cases possible to arise under the regulations, a consideration of the competing interests and the surrounding factual circumstances may result in a conclusion that it is reasonable to require an employee to submit to a polygraph examination utilizing control questions so that the resulting invasion of his privacy interest is not "unwarranted" or an "unreasonable" condition of his employment.

**4.**

The omission of the regulations to supply any standard to govern the agency in the exercise of its discretion to require an employee to submit to a polygraph examination would render the regulations invalid; and, to preserve their validity, we therefore construe them as containing the following standards applicable to any decision by the agency to require an employee to submit to such an examination:

a. An employee may not be required to submit to a polygraph examination unless the agency has first determined that the requirement is a reasonable one in view of the invasion of privacy that will necessarily follow, the public interest at stake in the case, whether reasonable alternatives exist, and indeed all other circumstances of the particular case. *New Jersey v. T.L.O.,* 469 U.S. ——, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (students do not waive all rights of privacy when on school grounds, but school officials' need for freedom to maintain order must be balanced against such rights and resulting comparison justifies search of student based merely upon reasonableness under all the circumstances rather than upon probable cause to believe student has violated the law or is doing so.)

b. In order that the foregoing standard may constitute a meaningful impediment to the possibility of arbitrary agency decisions, the determination must be made by a neutral agency official having no responsibility for the investigation and after notice to the employee that he may be required to take the examination, together with a reasonable opportunity on the employee's part to protest by evidence and argument the reasonableness of that contemplated action. *Cf., Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (decision of prison officials to withhold delivery of particular letter to inmate must be accompanied by minimum procedural safeguards to ensure that suppression of correspondence does not exceed legitimate interests of State in penal administration.) We hold these procedural safeguards to be the minimum necessary to preserve the procedural due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States. *See, Paul v. Davis,* 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976) (*procedural* guarantees of Fourteenth Amendment may apply when State seeks to remove or significantly alter legal interests previously recognized and protected by State law, even if such interest was not originally within "liberty" or "property" interest protected by *substantive* due process guaranteed by that amendment.)

## 5.

Our holdings are not to be construed as limitations upon the right of an employee to obtain from a district court injunctive relief against enforcement of an agency determination in his case, on a showing *in such court* in an *original* action that the examination would be unreasonable under all the circumstances. Tex. Civil Practice & Remedies Code, § 65.011 (1986); *State Board of Examiners in Optometry v. Carp,* 162 Tex. 1, 343 S.W.2d 242 (1961) (unlawful acts of public officials may be restrained where they would cause irreparable injury); *Missouri, K. & T. Ry. Co. of*

*Texas v. Shannon,* 100 Tex. 379, 100 S.W. 138 (1907) (contemplated acts by public officials not authorized by valid law may be enjoined where they will constitute unlawful interference with individual's rights).

Having imputed to the regulations the essential standards necessary to preserve their validity, we hold they are not invalid on the grounds they purport to authorize unreasonable conditions of State employment by permitting invasions of employee privacy in contravention of the common law of the State. We therefore reverse the judgment of the trial court declaring the regulations invalid on those grounds.[8] We

---

8. We should reply to certain aspects of the dissenting opinion:

(a) Implicit throughout the dissenting opinion is an assumed moral superiority that requires the dissent to reject on that ground any use of the polygraph for any purpose in any circumstances. The claim of moral superiority rings false, however, when it rests partly upon the dissent's frank admission that personal aversion to the polygraph was an important consideration in the result reached by the dissent. We had thought personal bias should have no part in the decision of an appellate tribunal that is supposed to be *neutral and open* to a party's contentions that the trial-court judgment results from *legal errors* committed by that court.

(b) The dissent enlarges the scope of the holding in *Talent v. City of Abilene, supra.* The dissent refers to the following passage from *Talent:*

> We do not mean to be understood as forbidding the use of polygraph tests by public officials when there is cause to believe a public employee has performed his official duties illegally. We do hold, however, that a fire chief has no authority to order such a test of a tenured employee about non-employment related subjects.

508 S.W.2d at 596. The dissent concludes that the first sentence in the passage refers only to law enforcement officials. We believe this to be an erroneous and rather strained interpretation of a passage that occurs only a few sentences after the Court had taken care to use and emphasize the term "law enforcement official." In *Talent,* it was subsumed by the majority that the criminal act charged against Talent was not employment-related because his possession of the stolen truck occurred off duty. The majority then held the fire chief had no authority to order Talent to submit to a polygraph examination on that subject. The basic issue in the present case is not addressed in *Talent.* In *Talent,* the majority and the dissent disagreed on whether the incident in question was employment-related. In the present case, it is assumed by the regulations and the parties that the *incident* to be investigated *is* employment-related. The point in controversy is whether the control questions, which inquire into matters not directly related to employment, deprive the entire examination of its employment-related character; or whether the control questions themselves *are* employment-related because they are *necessary* to a proper polygraph examination of an incident that is indisputably employment-related. As mentioned earlier, there is in the record scientific evidence that supports the agency's determination that the control questions are necessary to a proper examination, and only scant evidence that a useful examination may be conducted without the use of such questions.

(c) Some parts of the dissenting opinion suggest a view that the individual's right of privacy is absolute, which is to say that it must prevail in all circumstances possible to arise. If the right of privacy is absolute in the sense used in the dissent, then any controversy wherein the right is asserted must be determined instantly, automatically, and with suitable rhetoric in favor of the privacy interest. The premise of an absolute right controls and any countervailing considerations simply become immaterial. This view and premise are, of course, erroneous as pointed out in footnote five, save only in the Fifth Amendment context. If they were correct, search warrants could not issue even on the probable cause authorized by the Fourth Amendment; State officials would be excused the statutory duty of filing financial statements as nominally required by Tex.Rev.Civ.Stat.Ann. art. 6252–9b; one would not have to supply personal information of any kind to the State for any purpose whatever, including taxation, vital statistics, schooling, and so forth. This eccentric view of the right of privacy has never been entertained by any court so far as we have been able to determine, save in the context of the Fifth Amendment. We have, of course, remanded this aspect of the case to the trial court for its determination.

remand the case to that court for its determination of appellees' contention that the regulations are invalid on other grounds. We make no present ruling on the question of attorney's fees, reserving the matter until a final determination of the case.

BRADY, Justice, dissenting.

I respectfully dissent.

The majority has overlooked the time-honored rule in Texas that fact findings by the trial judge in a non-jury case, have the same presumption of conclusiveness and weight on appeal as a jury verdict. *Vandyke v. Austin Ind. School Dist.*, 547 S.W.2d 354 (Tex.Civ.App.1977, no writ). It is also the rule that where findings of fact made by the trial court are supported by any evidence of probative force, they must be sustained on appeal. *Rankin v. Carpenter*, 568 S.W.2d 198 (Tex.Civ.App.1978, no writ). A Court of Appeals cannot substitute its findings for those of the trial

(d) From the premise just described, the dissenting opinion proceeds at length to assail any use of the polygraph for any purpose in any circumstances. The dissent concludes that *any* use of the polygraph constitutes a violation of the right of privacy that may not be sanctioned by any court. *This is not an issue brought to this Court for resolution in this appeal nor is it an issue raised by the trial-court judgment.* Indeed, the appellees concede in their attack upon the regulations that use of the polygraph without control questions would *not* constitute an unwarranted invasion of employee privacy or an unreasonable condition of employment. The trial-court judgment rests upon findings of fact and conclusions of law that condemn the "control questions" as invasions of privacy, and not a use of the polygraph *per se*. Thus, the bulk of the dissenting opinion addresses an issue not in the case. Similarly, the issue of self-incrimination, addressed in one paragraph of the dissenting opinion, is not before us for adjudication and we have refused to pre-judge it in deference to the trial court.

(e) The dissent charges that we have substituted our own findings of fact for those of the trial judge. This is preposterous. The issue before us is the trial court's controlling *conclusion of law* to the effect that no countervailing public interest may ever justify the invasion of privacy that unquestionably results from utilizing control questions as part of a polygraph examination. We assume the correctness of all the trial court's findings of fact and quarrel only with the correctness of this *controlling* conclusion of law.

(f) We need not analyze the obvious error in the dissent's assumption of the existence of a "constitutional right of privacy" in the sense of a general right of privacy. The matter is discussed fully in the text of this opinion.

(g) The dissent attacks as "judicial legislation" our supplying the missing standards necessary to sustain the validity of the agency regulations. Really, however, the dissent simply quarrels with the decisions of higher courts that *require* us to do just that, specifically to ensure that the regulations "might in some future case withstand a constitutional attack." We refer particularly to *Railroad Commission v. Shell Oil Co.*, *supra*, and the Court's statement that the agency rule in question there "must be given a construction that will, if possible, sustain its validity, and that can only be done by laying down some standard to guide the Commission in the exercise of its discretion." 161 S.W.2d at 1026. We do not sit as a court of error to review the decisions of the Supreme Court of Texas.

(h) The most objectionable aspect of the dissenting opinion is its misleading implication that in some unexplained way our decision augments the power of Texas administrative agencies in regard to their use of polygraphs, with an attendant encouragement of "witch hunts" or an abusive use of the machines. The implication is as plain as it is ill-considered, even though the dissent does not attempt to show why or how this will be the result of our decision in this case.

This case does *not* come before us with a contention that the agency in question here, or any agency, *lacks power or authority* to utilize polygraph examinations. As mentioned above, that power and authority are conceded by appellees who quarrel only with the "control questions" the agency has chosen to utilize in the process of administering such examinations.

Whatever power existed in the judicial department to suppress a promiscuous or abusive use of the polygraph remains absolutely unimpaired by our opinion and decision. We have, for example, taken great care to emphasize the availability of injunctive relief to protect individuals in that regard, pointing out that any proceeding for such relief would be an original proceeding in district court with all the benefits implied by that kind of proceeding in favor of the individual as against the agency. Our decision can only *limit* the occasions when polygraphs may be utilized by the agency and the occasions when individuals may have to resort to the courts for protection. The contrary implication is false and unfair. Any use of the polygraph by State agencies raises serious legal problems that require careful legal reasoning if solutions are to be found that are consistent with the rule of law. These are not to be found in a restructuring of the case before us, in easy slogans, or in eccentric views of the applicable legal doctrines.

court if there is any evidence in the record to sustain the trial court's fact findings, as here. *Ray v. Farmers State Bank of Hart*, 576 S.W.2d 607 (Tex.1979). It seems to me that if we as an appellate tribunal attempt to supply a standard or framework for an agency determination of reasonableness before an employee may be required to submit to a lie detector test, we thus are in effect substituting our findings for that of the trial court. Further, it seems to me we are legislating by setting up standards that might in some future case withstand a constitutional attack as is made here by the appellees.

In *Talent v. City of Abilene*, 508 S.W.2d 592 (Tex.1974), the Texas Supreme Court in a narrow decision held only that a fire chief had no authority to order a polygraph test of a tenured employee about non-employment related subjects. The Court also said, as stated by majority, that "we do not mean to be understood as forbidding the use of polygraph tests by public officials when there is cause to believe a public employee has performed his official duties illegally." It should further be noted that the Supreme Court stated unequivocally:

> The question is not before us and we do not decide whether a law enforcement official has implied authority to order polygraph tests be taken by his or her subordinates concerning subject matters related to performance of their public trusts.

Finally, the high court concluded that "... under the circumstances of this case, the fire chief exceeded his implied authority in ordering the polygraph test."

The Texas Department of Mental Health and Mental Retardation here is not a law enforcement agency. As the trial judge stated in his finding of fact 23:

> The unique circumstances that may justify requiring police and fire personnel to take polygraph examinations do not exist with respect to TDMHMR employees.

It is not empowered by the Legislature to be a roving commission to detect crime or to enforce the criminal law. It has no indictment power, and the agency although they are intimately concerned with the welfare of patients in our mental institutions, are not employed as law enforcement officers. Careful reading of *Talent, supra,* should clearly instruct and convince us that the Court meant that "public officials" referred to were *law enforcement* officials. If every agency, board or commission in Texas decided to institute use of polygraph tests to investigate and assist it in its "ability to investigate" all of its serious problems, we would give license in Texas to overzealous state officials to engage in every manner of witch-hunt and investigate every situation which the agency managers felt involved a breach of state employee's official duties. A State employee presumably could be given a polygraph test if he was suspected of using alcoholic beverages while on duty. A secretary in any state agency or Commission could be compelled to take a polygraph test if a supervisor believed that she was violating in some matter the Commission's rules and regulations. A clerk in any State Department conceivably could be forced to take a polygraph test. The number and variety of situations would only be restricted by the limits of one's imagination. Clearly, state agencies do not, and should not, have such authority.

The majority concede that the regulations of the Texas Department of Mental Health and Mental Retardation fail to specify the circumstances under which an employee may be ordered to submit to a polygraph examination. The regulations listed by the majority which prescribe the *procedures* to be followed in administering the polygraph test give small consolation to the obvious humiliation and scandal which would attend such an ordeal.

The crowning jewel on these procedural instructions, conclude with this statement:

> By answering questions, you do not lose your constitutional rights against self-incrimination. The United States Supreme Court has held in the case of *Garrity v. New Jersey*, 385 U.S. 493 [87 S.Ct. 616, 17 L.Ed.2d 562] (1967) that answers to questions asked of a public employee

**518**

who faces job termination for refusal to answer cannot be used against the employee in a subsequent criminal proceeding. * * *

Small solace to the public employee compelled to take a lie detector test ordered by a superior, when only evidence of his misdeed, whatever it might be, was hearsay or the gossip around the office.

Although the majority's desire to further "an important and substantial public interest," i.e., the State's interest in a safe, orderly, efficient, and effective mental health system is to be commended, are we not succumbing to the temptation of what has become known as using the "cost benefit analysis" to solve our dilemma? I quote from a scholarly discussion by Judge Edmund B. Spaeth, Jr., presiding judge of the Pennsylvania Superior Court and lecturer at his University's Law School: "Is cost-benefit analysis the right way to resolve the philosophical conflict in our law?" I think we must ask ourselves this question: Are we prepared to sacrifice the time honored constitutional right of privacy of our public employees for a more orderly and efficient mental health system? The trial court's fact findings included this statement:

> TDMHMR's polygraph policy includes the use of control questions which constitute an intentional interference with an employee's interest in solitude or seclusion, either as to the person himself or as to the person's private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

The proven unreliability of the polygraph examination, as found by the trial court even when in the hands of the so-called "expert," would under the law preclude any use of "evidence" obtained; and if used, would constitute in my view a "clear violation of the public employees' constitutional rights against self-incrimination."

Abraham Lincoln, responding to the Dred Scott case, put this point well. Speaking of the authors of the Declaration of Independence and what was meant by the "inalienable rights to life, liberty and the pursuit of happiness," said:

> They meant to set up a standard maxim for a free society, which should be familiar to all, and revered by all; constantly looked to, constantly labored for, and even though never perfectly attained, constantly spreading and deepening its influence, and augmenting the happiness and value of life to all people. * * *

I would vote to affirm the judgment of the trial court.